Marion NAMENWIRTH, Plaintiff-Appellant,

v.

BOARD OF REGENTS OF the UNIVERSITY OF WISCONSIN SYSTEM, Defendant-Appellee.

No. 83–3155.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 14, 1984.

Decided Aug. 6, 1985.

Lester Pines, Cullen, Weston & Pines, Madison, Wis., for plaintiff-appellant.

Robert D. Petasky, State of Wis., Dept. of Justice, Madison, Wis., for defendant-appellee.

Before CUDAHY and POSNER, Circuit Judges, and SWYGERT, Senior Circuit Judge.

CUDAHY, Circuit Judge.

Appellant Namenwirth was denied tenure at the University of Wisconsin in Madison. After the Department of Labor found that she had been denied tenure because of her sex, she brought this Title VII

action in federal court; by agreement, the matter was heard by a magistrate, who found that the university had not discriminated against Namenwirth. We affirm.

### I.

Marion Namenwirth was hired as an assistant professor by the Department of Zoology of the University of Wisconsin-Madison in September of 1971. She was the first woman hired in a tenure-track position in thirty-five years, and apparently she was the first person in a tenure-track position ever to be denied tenure by the Department.

Her initial contract was for three years, and it was then to be renewed yearly until she was considered for tenure. A faculty member in such a tenure-track position who is not promoted to the tenured rank of associate professor after the sixth year must ordinarily leave the University after her seventh year.

The University of Wisconsin has had a record of sex discrimination. In 1970, prior to Namenwirth's hiring, only 150 of 2000 faculty members at the University of Wisconsin at Madison were female. Of these, half were in traditionally female departments such as nursing and home economics. Nearly all were in the lower ranks. Fifty academic departments had no women faculty members at all, even though between 10% and 38% of the Ph.D.s being awarded in those disciplines were being awarded to women. Responding to a complaint from a campus action group, the Department of Health, Education and Welfare in July of 1970 began an investigation into sex discrimination at the University. HEW found that there was a pattern of discrimination against women, and found significant discrepancies between the salaries of males and females in the same positions. In spite of an affirmative action program adopted by the university under

pressure from the federal government, the response of the science departments was slow. The magistrate found that in 1978, only six of 323 tenured faculty members in the science departments were women.

The record of the Zoology Department was apparently like that of the other science departments. Before Namenwirth was hired, the only woman to hold a tenure track position in the Zoology Department was Dr. Nellie Bilstad. Dr. Bilstad had received her Ph.D. from the University, and had been hired in 1931. The Department granted her tenure in 1942, and promoted her to associate professor in 1950. She remained an associate professor until 1969, the year of her retirement, when she was promoted to full professor. The magistrate found that Bilstad had been treated by her colleagues in a patronizing manner. He found that men who were junior to her and who had done little in the way of research rapidly moved beyond her in both salary and rank. He found that Dr. Bilstad was the victim of purposeful discrimination which reflected the discrimination prevalent in the University and in higher education in general in the time prior to the 1972 extension of Title VII to universities.

In 1971, Namenwirth was the only woman in a tenure track position in the Department. In 1976–77 she was considered for tenure.[1] The usual procedure is for the Department's Salary and Promotion Committee to consider the applicant and make a recommendation to the Department. The committee in this case favored Namenwirth's promotion by a slight majority but did not recommend promotion to tenure, a fairly unusual procedure. Instead, it prepared a report which, among other things, expressed concern about the strength of Namenwirth's research and publication record. This report ultimately became part of the Department's tenure packet on Namenwirth to the Biological Division Executive Committee, the committee responsible

---

**1.** The magistrate found that the standards for tenure in the Department did not change be-

tween 1968 and 1979.

1238

for making a recommendation one way or the other to the Dean of the College of Arts and Letters.

When the Namenwirth candidacy was presented for a vote, the Department voted 11–10 *against* recommending her for tenure. Dr. Namenwirth asked for reconsideration. She was asked to speak to the Department on her own behalf; after she spoke, another vote was taken, the result of which was 12–10 in *favor* of recommending for tenure. For some reason, reconsideration was asked again; the outcome was negative. Dr. Namenwirth requested reconsideration once more, and the final vote was 11–10 in favor of tenure, with three abstentions.

In preparing for the Department's consideration of Namenwirth, the Salary and Promotion Committee had requested letters evaluating Namenwirth's work from scholars outside the department. These letters and other materials relating to research, teaching and committee work were made part of a packet to be sent to the Divisional Executive Committee along with the recommendation for tenure. The packet also included a discussion of the departmental debate, and of the concerns the Department had about the wisdom of granting Namenwirth tenure. It mentioned the closeness of the Department vote. It analyzed the letters from the outside scholars, and pointed out the concerns those scholars had with Namenwirth's research.

Largely because of the closeness of the vote and the equivocal nature of the Department's recommendation, the Divisional Committee voted to deny her tenure, and the Dean of the College of Letters and Science, accepting the Divisional Committee's recommendation, notified the Department that he would not recommend Namenwirth for promotion and tenure. The Department then insisted that the Division clarify its reasons for denying tenure; the Division, under some pressure from Namenwirth, said that it would reconsider the case if the Department would reconsider it

first, resubmitting the case with updated documentation. The Department refused, insisting again on a better statement of reasons for the denial. The Division refused to issue a new statement and told Namenwirth that there would be no reconsideration of her tenure denial.

Namenwirth appealed to the University Committee in the summer of 1978. The University Committee recommended that the Divisional Committee reconsider the Namenwirth case, using the documents originally submitted by the Zoology Department and new material to be submitted by Namenwirth herself. They also recommended that she be kept on the faculty one more year.

In October, 1978, the Biological Division Committee reconsidered the Namenwirth decision, and again voted against tenure. The Dean of the College, again following the recommendation of the Divisional Committee, declined to recommend her for tenure, and at her request provided her with the following list of reasons:

(1) The narrow majority of the Zoology Executive Committee recommending you for tenure after initially voting against tenure by an equally narrow majority.

I have serious doubts about the wisdom of granting tenure unless a substantial majority of the executive committee recommends it. Unlike the Zoology Department, a number of our departments require a two-thirds majority to recommend tenure, a provision I favor and recommend to all L & S departments.

(2) The negative reviews by the Biological Sciences Divisional Committee, which twice recommended against your tenure by a large margin.

As you know, the four Divisional Committees are the general faculty's major quality control mechanism for faculty appointments to tenure. Each Committee operates across the entire University in its specialized area. A Dean must consult the appropriate Divisional Committee on the qualifications of all candidates

for tenure. Because the Divisional Committee reflects the opinions of scholars outside the Department but from fields closely related to it, and because it is a disinterested body concerned with the overall quality of the faculty of the University, a Dean must consider its advice on tenure cases very seriously.

(3) My concern about the serious budgetary problems of the College and the likelihood of further budgetary difficulties if our enrollment should level or decline in the next few years, as seems quite possible.

We presently face the need to reduce our staffing in some areas of the College. Under the circumstances, I believe it is especially important that we grant tenure only to those faculty members whose qualifications are beyond question and whose service is likely to be needed regardless of any enrollment fluctuations we can foresee at this time.

A number of men were recommended for tenure in the years surrounding the Namenwirth decision. Perhaps the most pertinent case is that of Dr. Timothy Moermond, who was recommended for tenure in the 1978–79 academic year. Moermond's publication record was similar to Namenwirth's; like hers, it seemed to improve as the time for the tenure decision approached. Among his letters from outside evaluators, some were positive and some were critical. At the time the department first considered him for tenure, he had no outside grant support. The vote in the department was unanimous in favor of tenure, and he was recommended to the Division Executive Committee.

Namenwirth relies in part on the difference between the way she was treated and the way Moermond was treated to support her claim of discrimination. She points to these particular differences:

—The rate of publication for each of them increased toward tenure time. In

the department's recommendation for Moermond, this was described as an expression of his meticulous approach to research. In the Namenwirth packet, it was described as the result of a last minute effort.

—The supervision of graduate students is an important part of teaching. The number of graduate students reported as being supervised by Namenwirth was lower than the actual number; according to Namenwirth, the number reported for Moermond was inflated.

—Each received critical comments from outside evaluators. Negative comments in the Moermond letters were minimized in the summary in his tenure packet sent to the Division. Negative comments about Namenwirth were highlighted.[2]

In spite of the unanimous recommendation from the Department, the Division Executive Committee found Moermond's record to be weak, and it voted to deny him tenure. Three Zoology faculty members appeared before the committee to argue his case. They presented additional material in his favor, including evidence of a grant he had received after the tenure packet had first been sent on. The Executive Committee reconsidered and recommended Moermond for tenure. Shortly thereafter he was promoted to a tenured rank. The Department had made no such effort in the Namenwirth case.

On July 25, 1979, Namenwirth filed a complaint with the Milwaukee office of the Federal Contract Compliance Division of the United States Department of Labor, alleging sex discrimination. After an investigation, the Department of Labor concluded that she had been denied tenure because of her sex. This determination was based, among other things, on the poor record of the University in having women in tenured positions and on the failure of the Department to advocate tenure for Namenwirth as aggressively as for Moermond.

2. At the trial before the magistrate, Namenwirth presented the testimony of Judith Laws, a social psychologist who has done research on sex bias in the workplace. Dr. Laws testified that such differences in treatment are indications of the presence of sexual bias.

In October, 1983, Namenwirth brought an action in the District Court for the Western District of Wisconsin, claiming a deprivation of rights secured by Title VII of the Civil Rights Act of 1964, as amended by the Equal Opportunity Act of 1972, 42 U.S.C. § 2000e, *et seq.* She alleged that the University denial of tenure was the result of disparate treatment. With consent of the parties, the case was brought before a magistrate under 28 U.S.C. § 636(c)(1). The magistrate found that Namenwirth had discharged her burden of establishing a prima facie case of disparate treatment because of sex; that the University had rebutted that case by arguing that her record did not satisfy the standard of excellence required by the University of Wisconsin at Madison; that the University's argument was genuine and reasonable; and that Namenwirth therefore failed to carry her ultimate burden of persuasion. He held that the denial of tenure was not based upon her sex, and dismissed her complaint with prejudice. On appeal, Namenwirth argues that the lower court misapplied the law; that it was not the duty of the magistrate to inquire into the reasonableness of the motive offered by the University, but rather to examine the evidence that the motive was pretextual.

## II.

▇ In a disparate treatment suit the plaintiff is required to establish a prima facie case of discrimination; if she succeeds, the university is called upon to give a non-discriminatory reason for failing to give her tenure; and, when the university has come forward with such a reason, the burden then rests with the plaintiff to prove discrimination. *McDonnell Douglas v. Green,* 411 U.S. 792, 807, 93 S.Ct. 1817, 1826, 36 L.Ed.2d 668 (1973). To establish a prima facie case of discrimination in tenure, the plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for tenure; (3) she was denied tenure; and (4) an applicant not in the

protected class was granted tenure. *Cf. Smith v. University of North Carolina,* 632 F.2d 316, 332 (4th Cir.1980). She may attack the motive advanced by the university in one of two ways: she may try to show that the motive is not worthy of belief; or she may try to show that in fact some other motive explains the university's action better than the motive offered. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1029, 1095, 67 L.Ed.2d 207 (1981). In either case she is not called upon to offer direct proof of discriminatory motive. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977).

▇ To prove the proffered motive is not worthy of belief, evidence of a comparative sort is appropriate: if others were hired or promoted though by the same reasoning they ought to have been excluded, then the motive is a "pretext." *Mozee v. Jeffboat,* 746 F.2d 365, 369 (7th Cir.1984). It is not determinative that the motive as applied to the plaintiff is "genuine," or "reasonable;" if it does not apply to all equally, it does not rebut a charge of discrimination. Thus, suppose a rule forbids the wearing of bracelets near certain machinery. Such a rule may indeed be reasonable, and the fact that she wore a bracelet near the machinery may be the reason—a genuine reason— that a certain woman was fired. But if men are exempted from the rule, whether intentionally or not, so that men who wear bracelets are never fired, then the reason is "pretext" in the technical sense given to that word by the law. Obviously comparative evidence is relevant in determining whether a motive is pretextual. As with the bracelets, the reason in isolation may be both genuine and reasonable, but that is not enough to show that its effect is not discriminatory. To show that, it must be shown that it does not work to the detriment of the protected class alone.

▇ The state of Wisconsin has argued in its brief to this court that comparisons

are out of place in a tenure decision. We disagree. Comparisons may be more difficult in the case of professional and academic employment decisions, but they may be essential to a determination of discrimination; and where they are, and where the evidence is available, they must be made.

### III.

The magistrate rejected many of the findings of fact proposed by the parties. The trier of fact has a substantial amount of discretion in this matter. Where it is clear that he has considered the evidence, we will not remand simply to have him produce more detailed findings of fact.

In this case it is true that the magistrate might have made more detailed findings, but it is also clear that he considered and took account of the relevant evidence. He elected not to make many of the findings suggested, many of which dealt with minutiae. He recognized and considered the issue of prior findings of discrimination by the University; the discriminatory treatment of the single woman to have been tenured by the department; and the comparative evidence concerning the qualification of males tenured at about the time Namenwirth was denied tenure. Since we believe that the magistrate did take account of the evidence, we do not believe that more extensive and detailed findings would change the outcome.

The plaintiff claims that the magistrate applied an incorrect standard. The magistrate found that the motive offered by the University for not offering Namenwirth tenure, that the quantity of her research output and the potential of her projected research did not satisfy the University's standard of excellence, was a reasonable one:

I am persuaded that the defendant Board's articulated reason for denying

tenure was the true and genuine basis for the challenged denial of tenure: a reasonable decision, with which others equipped to render the decision might differ, but which I cannot reject as arbitrary, that Namenwirth did not possess the requisite research credentials to satisfy the tenure standard.

It is true that if the magistrate had addressed himself to the University's proffered motive as a motive in the Namenwirth case only, isolated from other tenure determinations, then he would not have applied the correct standard. As we have already pointed out, to find merely that the motive was genuine (that is, that it really was the motive in this case) and reasonable does not suffice to show that it was not pretextual, in the sense required by law. For if the same explanation, however genuine or reasonable, were used to exclude only members of a protected class—as when, in the example above, women were fired for the wearing of bracelets but men were not—then in the eyes of the law the explanation would be pretextual. So here, if the proffered motive, however genuine in the particular case, however reasonable in general, operated only to exclude women, it would be pretextual. And if the magistrate considered only the genuineness and reasonableness of the motive in isolation, he did not apply the correct standard.

█ But the magistrate did apply the correct standard in this case. He might have worded his conclusion a little more felicitously. He might, for example, have been more specific, finding that in the eyes of the department Moermond showed greater promise than Namenwirth. But he *did* consider the comparative evidence; he *did* explicitly find that men in Namenwirth's position would not have been treated differently,[3] and he concluded that the

---

**3.** The magistrate's last three findings of fact were the following:

    81. In the course of Namenwirth's tenure consideration, a sizable minority of the Zoology Department tenured faculty in fact decided

that Namenwirth did not meet the standard for tenure at the UW-Madison, principally because of the deficiencies they perceived in her research output and potential. This was a reasonable decision, and the articulated rea-

motive was not "arbitrary." A motive which is applied in some cases and not in others, not along lines of principle (or of *acceptable* principle), is arbitrary, and we cannot imagine what the magistrate would have meant by the use of the word if he did not mean that the University's standards of excellence were applied to all equally.

Since we find that the magistrate has adequately considered the evidence, and has applied the appropriate standard, it remains for us to determine whether his finding of no discrimination is clearly erroneous.

### IV.

■ Namenwirth argues that she is qualified and ought to have been tenured. The magistrate found in fact that she was qualified; that was the basis on which he found that she had made a prima facie case. But it does not follow that she ought to have been awarded tenure. Mere qualification depends on objective measures— the terminal degree, the number of publications, and so on. Tenure requires something more; it requires that the department believe that the candidate have a certain amount of promise. The magistrate compared her record with the record of men who were awarded tenure and determined that the claim that the Department—and the University—found insufficient promise in Namenwirth's work was not pretextual. We have examined the records of Namenwirth and the various male candidates, and we cannot say that

the magistrate's conclusion is in clear conflict with the evidence.

The evidence consists for the most part of comparative evidence of research quality and potential. That means that it consists in large part of the opinions of academics who serve not only as experts on qualifications but also as decision-makers in the tenure process. It is not our role, as federal courts have acknowledged, to consider merely the hard evidence of research output and hours spent on committee work, and reach tenure determinations *de novo*. A crucial part of the evidence we rely on is the esteem in which the candidate is held by the very persons making the tenure decision.

Thus, in the case before us, Namenwirth's bid for tenure was defeated primarily by the close departmental vote and the equivocal recommendation which issued from that vote. If we consider the department vote as an assessment of qualification by experts in the field—and there is no doubt that it is that—then the University's denial of tenure is based on rather hard evidence that Namenwirth was not as well qualified as those who were granted tenure. But the department vote is not just an independent assessment of qualifications; it is actually the first step in the decision process, and for most candidates it is the most important step. For many candidates it is the department that actually makes the decisions, and it is clear that it was the department that made the decision in Namenwirth's case.

son for the decision is not a pretext. If all other factors had been the same, but Namenwirth had been a man and not a woman, the decision of the sizable minority of the Zoology Department would have been the same: to oppose Namenwirth's tenure.

82. In April of 1977 and again in October of 1978, the Divisional Committee in fact decided that Namenwirth did not meet the standard for tenure at the UW-Madison, particularly in the area of research. This was a reasonable decision, and the articulated reason for the decision was not a pretext. If all other factors had been the same, but Namenwirth had been a man and not a woman, the

decision of the Divisional Committee would have been the same: to reject Namenwirth's tenure.

83. In May of 1977 and again in February of 1979, Dean David Cronon in fact decided that Namenwirth did not meet the standard for tenure at UW-Madison, particularly in the area of research. This was a reasonable decision, and the articulated reason for it was not a pretext. If all other factors had been the same, and if Namenwirth had been a man and not a woman, the decision of Dean Cronon would have been the same: to deny tenure to Namenwirth.

To allow the decision-maker also to act as the source of judgments of qualification would ordinarily defeat the purpose of the discrimination laws. But in the case of tenure decisions we see no alternative. Tenure decisions have always relied primarily on judgments about academic potential, and there is no algorithm for producing those judgments. Given the similar research output of two candidates, an experienced faculty committee might—quite rightly—come to different conclusions about the potential of the candidates. It is not our place to question the significance or validity of such conclusions.

But to say all that is only to face up to the problem. The problem remains: faculty votes should not be permitted to camouflage discrimination, even the unconscious discrimination of well-meaning and established scholars. The courts have struggled with the problem since Title VII was extended to the university, and have found no solution. Because of the way we have described the problem—the decision-maker is also the source of the qualifications—there may be no solution; winning the esteem of one's colleagues is just an essential part of securing tenure. And that seems to mean that in a case of this sort, where it is a matter of comparing qualification against qualification, the plaintiff is bound to lose.

But there are other sorts of cases. There are cases that involve a *pattern* of discrimination. *Hazelwood School District v. United States*, 433 U.S. 299, 307, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977). There are cases in which procedural barriers are placed in the way of members of a certain class. *See, e.g., Kunda v. Muhlenberg College*, 621 F.2d 532, 546 (3d Cir. 1980). There are cases that involve outright discriminatory judgments. *See, e.g., Lynn v. Regents of the University of California*, 656 F.2d 1337, 1343 (9th Cir.1981), *cert. denied*, 459 U.S. 823, 103 S.Ct. 53, 74 L.Ed.2d 59 (1982). Thus, although we may despair of extricating discriminatory motives from collegial judgments about poten-

tial and worth, the outlook is not entirely bleak.

In this case, there was some evidence of past discrimination on the part of both the University and the Department. That evidence could not offset the rather substantial evidence of the close department vote; and while such a vote might itself be an indication of bias, on the evidence before him the magistrate was not clearly wrong in deciding that in this case no bias was involved.

While Namenwirth's record was in many ways similar to the records of men who were tenured in the same time period, there were also differences which would have justified the difference in the votes. Moermond, for example, was the editor of a respected professional journal. We have said that we would not review the evidence *de novo*, and we will not; but the clear *drift* of the evidence is this: that the Department anguished over the Namenwirth decision and that in the end its equivocal recommendation to the Division reflected its own uncertainty; that it felt varying degrees of uncertainty about the male candidates, but in no case as serious an uncertainty as in Namenwirth's case; and that its unwillingness to press Namenwirth's case as strongly as it pressed the cases of the others was based on perceptions of promise.

We conclude that the magistrate's finding of no discrimination was supported by the evidence, and that in this case there was no convincing evidence of other sorts to counter that evidence.

The judgment of the district court is therefore affirmed.

SWYGERT, Senior Circuit Judge, dissenting.

The magistrate correctly found that Namenwirth had established a prima facie case of sex discrimination and that the University of Wisconsin discharged its bur-

den to articulate a legitimate, nondiscriminatory reason for its decision to deny Namenwirth tenure by producing evidence tending to show that her research output and potential did not satisfy the University's high standards. But the magistrate's finding that this legitimate, nondiscriminatory reason was not pretextual was clearly erroneous. I would therefore reverse and remand for a calculation of damages.

The majority wrestles with the problem of how to effectively review tenure decisions given that the dispositive factor in such decisions is the ability of the candidate to win the esteem of the very people whose sexual biases are in question. It concludes that courts must generally defer to the expertise of academic peers in reaching subjective judgments about a candidate's academic standing and potential. Consequently, "in a case of this sort, where it is a matter of comparing qualification against qualification, the plaintiff is bound to lose." *Ante* at 14.

While I commend the majority for its frankness, I dissent from its defeatism.[1] The notion that tenure decisions must be accorded special deference was put to rest in 1972, when Congress, expressing concern about widespread discrimination against women in academia, removed academia's exemption from Title VII scrutiny. Pub.L. No. 92–261 § 3 (codified at 42 U.S.C. § 2000e–1 (1982)); H.Rep. No. 238, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Ad.News 2137, 2155. "Congress must have recognized that in order to achieve its legislative goals, courts would be forced to examine critically university employment decisions." *Davis v. Weidner*, 596 F.2d 726, 731 (7th Cir.1979).

In any event, I do not see a qualitative distinction between a tenure decision and any other employment decision. The subjective esteem of colleagues and supervisors is often the key to any employment decision. Yet, especially in the blue-collar context, the courts have not hesitated to review with great suspicion subjective judgments that adversely affect minorities.[2] *E.g., Albemarle Paper Co. v. Moody*, 422 U.S. 405, 433, 95 S.Ct. 2362, 2379, 45 L.Ed.2d 280 (1975) (criticizing employer's evaluation of employees as "extremely vague and fatally open to divergent interpretations" and concluding that there is "no way to determine whether the criteria *actually* considered were sufficiently related to the Company's legitimate interest in job-specific ability to justify a testing system with a racially discriminatory impact"); *Rowe v. General Motors*, 457 F.2d 348, 359 (5th Cir.1972) ("procedures which depend almost entirely upon the subjective evaluation and favorable recommendation of the immediate foreman are a ready mechanism for discrimination"); *see generally* Bartholet, *Application of Title VII to Jobs in High Places*, 95 Harv.L.Rev. 945, 973–78 (1982). Indeed, subjective esteem is more important in certain blue-collar contexts, where, for example, lives may depend on the employee's performance and good judgment. *Accord* Bartholet, *supra*, 95 Harv.L.Rev. at 983. And because all lawyers and judges are trained in academia, courts are better equipped to scruti-

---

**1.** In fairness to the majority, I agree that some disparate treatment actions are more likely to meet with success than others. *Cf. Davis v. Weidner*, 596 F.2d 726, 732 (7th Cir.1979) (focusing on statistical evidence or lack of procedural safeguards may be winning strategies). One commentator has urged plaintiffs in tenure cases to abandon disparate treatment theories in favor of disparate impact theories, as the employer bears a heavier burden to explain the legitimacy of statistical disparities in the latter context. Bartholet, *Application of Title VII to Jobs in High Places*, 95 Harv.L.Rev. 945, 1004–06 (1982).

**2.** Although the amenability of subjective job criteria to abuse is most often criticized in the disparate impact context, the same criticism would seem to apply in the disparate treatment context. For a disparate treatment case that similarly criticizes subjective criteria, *see Davis*, 596 F.2d at 732 (absence or extreme generality of standards for selecting employees combined with lack of minority representation on decisionmaking bodies that apply subjective criteria lend special credence to claim of disparate treatment).

nize academic decisionmaking than decisionmaking in the perhaps less familiar blue-collar context. *Id.* at 979.

Of course, to recognize that tenure decisions are not different in kind from other employment decisions is not to diminish the difficulties that are common to the judicial review of all subjective employment decisions. But it does allow us to resort to some useful tools that we have applied to strike down employment practices in the blue-collar context. The first tool is not to abandon our common sense. Although this is not a disparate impact action, we are entitled to draw a strong inference of discriminatory treatment from disparate impact. *See Davis,* 596 F.2d at 732; *see also supra* note 2. Namenwirth was the second woman ever appointed to a tenure track position by the Zoology Department. The first had been the victim of sex-based discrimination throughout her career. Finding of Fact No. 40. Namenwirth was the only person ever to be denied tenure by the Department. And despite the University's claim that events during the 1970's caused the University to grant tenure less liberally, male candidates who were reviewed immediately before and after Namenwirth were granted tenure. Nor is Namenwirth a statistical anomaly. As of 1978, despite pressure from Congress and the HEW to correct its past history of discrimination, only six of 323 tenured faculty members in the University's science departments were women. Finding of Fact Nos. 41–47.

A second tool is to correct for our lack of academic expertise by relying on outside experts. Tenure decisions are especially susceptible to this approach because in assessing research output, the University is concerned with how the research is being received in the academic community as a whole. One objective means of assessing this reception is the number of publications in journals generally regarded as prestigious. Another admittedly more subjective but nevertheless reviewable means of assessing research output are the opinions of outside experts solicited by the University. Under both criteria, Namenwirth's research output was superior to that of Moermond, a male colleague tenured several months after Namenwirth's review.

At the time of her review, Namenwirth had published four articles in *Developmental Biology,* the most prestigious journal in her field.[3] One other article was listed as submitted to *Developmental Biology,* and she had also published a discursive article that was not considered an academic research piece. Moermond had published only two articles in prestigious journals of comparable quality to *Developmental Biology.*[4] Another article was published in the *Journal of Herpetology,* which one reviewer had described as a "second rate" journal.[5] Like Namenwirth, Moermond had also published one popular article. Moermond listed two other articles as submitted for publication.

Turning to more subjective criteria, Namenwirth and Moermond received mixed reviews from outside scholars. The clear consensus with respect to both candidates was that their research output was low in quantitative terms. Issue was joined, then, on whether the quality of their output was sufficiently high to counterbalance quantitative deficiencies. Three of Namenwirth's reviews could properly be described as negative. Professor Blackler was highly critical of Namenwirth's failure to publish

---

**3.** Namenwirth's publications are listed in Plaintiff's Exhibit 53 at H–8. One of the four articles was listed as "in press" at the time of her tenure review. That *Developmental Biology* is the most prestigious journal in the field was uncontested. *See, e.g.,* Transcript of Proceedings ("T."), Vol. 6 at 31 (testimony of Professor Auerbach).

**4.** Moermond's publications are listed in Plaintiff's Exhibit 120 (Curriculum Vitae at p. 5). Moremond's two articles in *Ecology* and *Behavior* were both listed as "in press." One of Moer-

mond's negative reviewers conceded that both journals were "well respected, refereed journals." *Id.* (letter of Henry M. Wilbur). *See also id.* (letter of M.F. Willson) (*Ecology* is the major publication outlet for U.S. ecology); T., Vol. 16 at 29–30 (testimony of Professor Porter) (*Ecology* is a prestigious journal).

**5.** Plaintiff's Exhibit 120 (letter of Henry M. Wilbur). This description was unrebutted.

more and questioned the ultimate value of her approach. Nevertheless, he acknowledged Namenwirth's technical innovations and conceded that although the ultimate success of her approach to fundamental biological issues was a bad gamble, any success would be "exciting." Similarly, Professors Mahowald and Smith expressed grave reservations about the ultimate success of Namenwirth's regional localization work. Yet both were constrained to acknowledge the high quality of the work she had completed. Four reviewers recommended tenure after stressing Namenwirth's enthusiasm and innovativeness. Plaintiff's Exhibit 57 at H–68, H–77, H–78, H–80. One of those reviews was a rave, characterizing Namenwirth's limb regeneration work as the "most significant new work in the last 10 years."[6] A final reviewer characterized Namenwirth's re-

search output in positive terms, but concluded that quantitative concerns made tenure premature. Plaintiff's Exhibit 57 at H–71.

Three of Moermond's reviews were negative. These negative reviews were different in kind from those received by Namenwirth. Even the negative reviewers had to acknowledge Namenwirth's innovativeness and originality, and that she had at least published work that was recognized in the field. The negative reviews of Moermond, by contrast, criticized Moermond precisely because he had done nothing original, innovative, or which had had any impact on the field.[7] Three of the positive reviewers were willing to recommend tenure on the basis of Moermond's established reputation as an ecologist.[8] Two others recommended tenure on the basis of his research potential.[9]

---

**6.** Plaintiff's Exhibit 57 at H–80. The rave review was particularly worthy of credence because its source was the Chairman of the Department of Anatomy at Harvard Medical School and an acknowledged leader in the field. *See* T., Vol. 1 at 117–18; T., Vol. 5 at 50 & 141.

**7.** *See* Plaintiff's Exhibit 120 (letters of Professors Wilbur, James, and Roughgarden). Although Professor Wilbur acknowledged that Moermond was a good writer who was sufficiently "competent" to publish at least two articles in well-respected journals, he concluded that even these articles were "neither innovative nor definitive." Professor James similarly noted Moermond's lack of "originality" and also criticized Moermond's failure to show "critical thinking." Dr. Roughgarden concluded that "Dr. Moermond would definitely not attain tenure at Stanford on the basis of this record" and that "I doubt that he could be considered among the top twenty ecologists of his age class working with terrestrial vertebrates. He will never approach the international stature of scientists in your department like Warren Porter."

**8.** Plaintiff's Exhibit 120 (letters of Professors Schoener, Fagen, Willson). Professor Schoener believed that although Moermond's articles in *Ecology* and in *Behaviour* were still in press, they would be highly influential and had already attracted recognition in the field, apparently through informal circulation. Professor Fagen stated that "Tim Moermond's professional reputation is well established and has long since been recognized outside the Department." Citing Moermond's appointment as an editor of *Ecology,* Professor Willson concluded that "Tim

is certainly recognized professionally beyond his own department."

Like Namenwirth, Moermond did receive one "rave" review: that of Professor Schoener. Schoener stated that "Moermond is very likely the best person over a certain interval of the individual-population-community-ecology continuum" and that he was "clearly *on his way* to becoming a major figure in the area of ecology and evolutionary biology" (emphasis added). It is interesting to note, however, that Schoener had to base his conclusions on research potential rather than output. Moermond's best articles had not been published, so it was premature to conclude that Moermond was already a major figure in any respect. Namenwirth, by contrast, had already established herself in the limb regeneration area with articles in print. *See supra* note 6 and accompanying text.

**9.** Professor Williams recognized Moermond's lack of publications, but concluded that "[h]e *begins,* as your Department's statement requires, to be recognized as the very good man that he is" (emphasis in original). Professor Werner wrote a highly positive recommendation, praising Moermond's breadth of interest and originality. He was constrained to conclude, however, that "Moermond's publication record at this stage is at obvious odds with his capabilities and industry as a scientist." Based on his knowledge of Moermond and the preliminary reception of Moermond's unpublished work, Werner concluded: "I think Moermond has the tools and intellect to be an important ecologist and will become increasingly recognized as he gets his work into the literature." Plaintiff's Exhibit 120.

In sum, Moermond had published fewer articles in prestigious journals, and his current impact on the field was open to serious question. Namenwirth, by contrast, had published more articles in prestigious journals, and none of the reviewers could question that her research had had an impact in the field. The concern about Namenwirth was whether she could follow up on her work in any meaningful way. But with respect to research output exclusively, Namenwirth was decidedly superior to Moermond. The court needs no special expertise to reach such a judgment; all that is required is a willingness to read the expert judgments of others and determine what conclusions about the relative merits of Namenwirth and Moermond could plausibly be drawn therefrom. To be sure, given the University's high prestige, Namenwirth and Moermond were both marginal candidates; but it was clearly erroneous to find that Moermond had a superior research record that justified a different tenure decision in his case.

The more difficult question is whether Moermond enjoyed a sufficiently superior research *potential* to justify the disparate treatment. The majority ultimately relies on this factor to affirm the magistrate's findings. *Ante* at 13–14. The University's judgment in this regard is subjective and based on a considerable body of expertise. But the University does not express its judgment in a foreign language. No institution is better equipped than the impartial finder of fact—whether it is a jury or a judge—to evaluate whether stated reasons plausibly follow from stated premises and whether the stated motive of human behavior is the true motive.

Several of the factors that were urged as distinguishing Moermond's potential from that of Namenwirth can be dismissed in summary fashion. First, the University stresses that Moermond's future research would definitely be funded because he received a large grant from the National Science Foundation shortly before he was granted tenure. However, this was not known to the Department at the time it unanimously recommended Moermond for tenure. Rather, at the time of their respective tenure reviews at the Departmental level, both had generated roughly the same amount of outside grant support.[10]

Second, the University argues that Moermond had a larger stable of graduate students, while Namenwirth's lab appeared to be relatively inactive.[11] Thus, on the one hand, the University urges that Moermond could generate more research by relying on a greater supply of graduate students, yet on the other hand, Namenwirth is criticized for stealing the work of her graduate students.[12] In any event, the Department of

---

**10.** Namenwirth had received $63,000 in outside grant funding while at Wisconsin. Plaintiff's Exhibit 53 at H–11. Moermond had received three grants totalling $74,695. Plaintiff's Exhibit 120 (Curriculum Vitae at 2). Both had allowed their grants to expire. Moermond listed a new grant proposal as submitted. Namenwirth withdrew her proposal for a renewal of her grant pending publication of the research funded by the original grant, T., Vol. 12 at 14 (testimony of Namenwirth), inasmuch as such publication was a prerequisite for a renewal, T., Vol. 16 at 106–09 (testimony of Dr. Borisy).

Namenwirth was roundly criticized for allowing her grant to expire and for lacking any current funding. T., Vol. 8B at 60 (testimony of Hanson); T., Vol. 14 at 88–89 (testimony of Abrahamson); T., Vol. 16 at 13–14 (testimony of Porter); T., Vol. 17A at 32–33 (testimony of Auerbach). Moermond's lack of current funding was not discussed and, apparently, was considered unimportant. Stanley Dodson, the last candidate to be reviewed before Namenwirth, was granted tenure even though he had never received any outside grant money. T., Vol. 3 at 141 (testimony of Dodson). His lack of funding was not mentioned in his tenure documents. Plaintiff's Exhibit 119.

**11.** T., Vol. 8B at 23–26 (testimony of Hanson); T., Vol. 13B at 94 (testimony of Abrahamson); T., Vol. 17A at 32–33 (testimony of Auerbach).

**12.** Professor Blackler, the most negative outside reviewer, expressed doubts about how much credit should be given Namenwirth for articles she coauthored with graduate students. Plaintiff's Exhibit 57 at H–67, H–68. Although at least two Department members took exception to this suggestion that Namenwirth had pirated work from others, T., Vol. 4 at 99–100 (testimony of Neess); T., Vol. 8B at 42–43 (testimony of Hanson), the Department took care to emphasize the role of others in contributing to Namen-

Labor found[13] that the number of graduate students who actually stayed on to receive degrees in both labs—a better indication of research potential inasmuch as those students produced extensive research theses that could be turned into published works[14]—was comparable.[15]

Third, the Department stresses that Moermond's appointment, at a relatively youthful age, as an editor of *Ecology* was a good indication that he was an up-and-coming force in the field. Yet, neither the majority, *see ante* at 15, nor the Department even considered Namenwirth's comparable achievement as a recognized authority in the regeneration area, whose work was characterized as the "most significant new work in the last 10 years," *see supra* note 6 and accompanying text, and who routinely reviewed manuscripts for the editor of *Developmental Biology*. Plaintiff's Exhibit 57 at H-80.

Ultimately, the University does rely on one factor distinguishing Namenwirth that is more difficult to dismiss. Several members of the Department testified that Namenwirth's immediate research plans with respect to regional localization were so ambitious as to be naive. The Department simply did not believe that Namenwirth, admittedly a marginal tenure candidate, was capable of undertaking an enormous research project that dealt with the most fundamental problems of developmental biology.[16]

Although this court should hesitate to second-guess such a judgment, we should

also recognize that the Department's judgment of its employee's potential is not different in kind from any other employer's judgment of potential. It is generally recognized among industrial psychologists that the best predictor of future success is past performance. *See, e.g.,* R. Guion, *Personnel Testing* 380 (1967); Owens, *Background Data,* in *Handbook of Industrial and Organizational Psychology* 609, 625 (M. Dunnette ed. 1976); Bartholet, *supra,* 95 Harv.L.Rev. at 975 & n. 101. Given that Namenwirth's past research record was superior to that of Moermond, the Department's failure at least to accord Namenwirth the benefit of the doubt is suspicious.

In any event, I am willing to concede that it is entirely possible that an unbiased Department may well have seen more promise in Moermond's research plans despite his inferior past record. What troubles me, and what I believe is the key to this case, is the Department's failure even to consider Moermond's weak points. Moermond's research plans were hardly modest. His work occupied the "individual-population-community-ecology continuum" and he combined "behavorial ecology" with "functional morphology" and "physiological ecology." *See* Plaintiff's Exhibit 120 (letter from Professor Schoener). Yet, rather than criticize Moermond for his "naivete" or question his ability to accomplish his broad research goals given his marginal past record of output, the Department praised him for his breadth of vision.[17] If in fact rigorous standards for

---

wirth's work. Thus, in the cover letter to Namenwirth's file, the Department characterized Namenwirth's egg-slicing work as having been completed by Terry Moen, a laboratory technician, and Namenwirth's regeneration work was characterized as "reflecting graduate studies plus graduate student Master's research (Dunis)," Plaintiff's Exhibit 53 at H-7.

13. Namenwirth filed a sex-discrimination complaint with the Labor Department's Office of Contract Compliance Programs. The agency found that the University had denied Namenwirth tenure on the basis of her sex. Its findings are reprinted in Plaintiff's Exhibit 139.

14. *See* T., Vol. 8B at 23-26 (testimony of Hanson).

15. Plaintiff's Exhibit 139 at text accompanying notes 7-8.

16. *E.g.,* T. Vol. 15 at 15, 17 (testimony of Abrahamson); T., Vol. 16 at 17-18 (testimony of Porter); T., Vol. 16 at 95 (testimony of Borisy); T., Vol. 21 at 90-91, 94, 97 (testimony of Sonneborn).

17. *E.g.,* Plaintiff's Exhibit 120 (Porter's cover letter at 2 (quoting with approval comments by graduate students)); *id.* (letter from Emlen); *id.* (letter from Dodson); T., Vol. 15 at 169 (testimony of Plaut).

assessing research potential were applied to all candidates, one would have expected at least some discussion of Moermond's liabilities in this regard.

When it reviewed Namenwirth, the Department extensively debated her research potential and, after four ballots, recommended tenure by a one-vote margin. This equivocal recommendation combined with the failure of the Department to fight for Namenwirth when its recommendation was reviewed and overruled by the upper levels of the University hierarchy caused Namenwirth to be denied tenure. *Ante* at 1242.[18] When Moermond was reviewed, the Department failed even to discuss the possibility that his research potential might be low in view of his broad ambitions and his marginal past record. Nor was the quality of his past work questioned. Rather, the

Department's primary concern was how to secure the University's approval of tenure given Moermond's low quantity of publication. And in contrast to the agonizing debate and multiple ballots that characterized its review of Namenwirth, the Department unanimously voted in favor of tenure for Moermond on the first ballot after no debate.[19] Furthermore, after a vigorous lobbying effort, it persuaded the University to ratify its decision.[20]

In sum, the Department was faced with two marginal candidates for tenure.[21] If different perceptions of research potential were the real reason for the different tenure decisions in each case, there would have been at least some discussion of Moermond's liabilities that paralleled the discussions in Namenwirth's case. Something

**18.** There can be no question that the Department's "recommendation" for tenure was the proverbial kiss of death. The Divisional Committee that reviewed the Department's recommendation was a quality control device that denied tenure to twenty-five percent of all applicants, despite strongly positive recommendations by the relevant departments in most cases. *See* T., Vol. 8B at 28 (testimony of Hanson). To make matters worse, Professor Burns' cover letter in Namenwirth's tenure packet emphasized the Department's ambivalence:

> Our past recommendations to promote have been by large majorities. What perhaps is worth noting here is not so much the closeness of the vote, but the absence of really strong convictions on the part of the voters that they are absolutely right or secure in the position they have taken. This ambivalency of the faculty in itself tends to weaken a posture in defense of not reviewing an appointment. In view of the serious consequences to Dr. Namenwirth's career that are involved in a decision of this magnitude, I would have hoped for [a] stronger mandate.

Plaintiff's Exhibit 53 at H–14. Rather than unambiguously recommend Namenwirth, Professor Burns expressed his "hope" that the Divisional Committee would "concur with the finally expressed will of the majority of the Zoology Faculty." *Id.*

**19.** Professor Neess testified that at the very beginning of Moermond's review, some faculty members questioned Moermond's work as too theoretical. Nevertheless, the faculty quickly established a general agreement that Moermond was a strong candidate for tenure. T., Vol. 4 at 51–52, 64–65. Although some faculty members initially were concerned about Moermond's pa-

per credentials, those concerns were not voiced, and Moermond's record and potential were not subjected to the kind of scrutiny that characterized Namenwirth's review. The faculty as a whole was willing to defer without question to the strong and unequivocal support of the ecologists who worked most closely with Moermond. *See* T., Vol. 8B at 33 (testimony of Hanson); T., Vol. 15 at 71–72 (testimony of Abrahamson); T., Vol. 16 at 156–57 (testimony of Ris); T., Vol. 17B at 59 (testimony of Stretton). In sum, Moermond's marginality was neither recognized nor discussed, whereas even the strongest supporters of Namenwirth characterized her as a marginal candidate. *See* T., Vol. 4 at 65 (testimony of Neess); T., Vol. 17B at 43 (testimony of Stretton); T., Vol. 18 at 138 (testimony of Dodson).

**20.** The Divisional Committee initially voted to deny tenure despite the Department's unanimous recommendation. The Department urged the Committee to reconsider. Three Zoology professors appeared before the Committee to argue Moermond's case and additional material was presented in his favor. The Committee then voted to uphold the Department's recommendation. By contrast, when the Committee initially rejected Namenwirth, the Department merely asked for a clarification of reasons and refused the Committee's invitation to reconsider the case. In the end, Namenwirth received a second, though again unfavorable review only because University officials ordered it. *Ante* at 1238.

**21.** Given the University's initial rejection of both candidates, any other conclusion would be clearly erroneous.

other than strict standards for research potential caused the Department to ignore Moremond's marginality completely. Based on my review of the entire record, I am left with a "definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The University's explanation that Namenwirth's lower research output and potential justified a different tenure decision in her case is pretextual, and the magistrate's finding to the contrary should be reversed as clearly erroneous.

It is, of course, possible that some legitimate reason other than its perceptions of research output and potential caused the Department to grant tenure to the male candidate rather than the female candidate. It is clear from the record that many members of the Department were fond of Moermond. Even though personal popularity would be a poor reason to promote one candidate over another and even though such a criterion is not recognized by the University, this court does not review the wisdom of any particular tenure decision; we merely determine whether the decision was the product of invidious discrimination,

not if it was wise. Yet the University did not argue that it promoted Moermond on sexually-neutral popularity grounds. It argues, instead, that it promoted Moermond solely because he possessed superior research output and potential. Because the only legitimate, nondiscriminatory explanation of the tenure decisions proffered by the University is pretextual, Namenwirth is entitled to prevail on the merits.

In any event, it is difficult to believe that any factor other than sex explains the double-standard applied by the University in its reviews of Moermond and Namenwirth. Although many of the faculty members were clearly appalled by Namenwirth's allegations of sex bias, sex bias need not be conscious to be actionable. The most likely explanation for the events at bar is that Namenwirth was scrutinized by the Department because she was a woman breaking new ground.[22] The Department wanted, at least consciously,[23] to accept a woman as a peer, but it did not want to lower its standards for the sake of affirmative action.[24] Accordingly, when Namenwirth turned out to be a marginal performer, many members of the Department refused to give Namenwirth the benefit of the

---

[22]. Although one female professor had previously been tenured, she had been the victim of sex discrimination throughout her career and had since retired. Finding of Fact No. 40. Namenwirth was therefore the first woman to be hired with the expectation that she would compete on equal terms with her male peers. The Department frankly acknowledged that "no faculty member in our department in recent years has had his credentials and activities so thoroughly examined as Dr. Namenwirth." Plaintiff's Exhibit 53 at H–12. Professor Neess remarked:

In spite of our attempts to convince ourselves otherwise, we have in fact invented a new procedure to use in considering her promotion. To the best of my recollection, we have not before made the same effort to collect opinions from people outside the Department, especially not from people with no previous associations or who would not be expected in advance to favor promotion.
Plaintiff's Exhibit 59.

[23]. This may be a charitable assumption. It was undisputed that one professor told Namenwirth that the only reason she was considered for a job at Wisconsin was her sex. T., Vol. 8A at 17;

*but see* T., Vol. 18 at 68 (comment was meant in jest). Namenwirth also introduced evidence tending to show that another member of the Department seriously discussed whether women were equipped to "do science." T., Vol. 11 at 17.

[24]. Thus, when arguing for the advantages inherent in a sexually-integrated department, Professor Neess saw the need to qualify his remarks: "For one, she [Namenwirth] is a woman, and I make this remark not in a simple-minded ERA spirit." Plaintiff's Exhibit 59. The perception that affirmative action posed a grave threat to the meritocratic ideals of the Department perhaps explains Professor Auerbach's comment that he operated on the assumption that the University would never deny tenure to a woman. T., Vol. 6 at 43. Thus, Auerbach did not see the need to forge some consensus about Namenwirth's qualifications and attempt to sell it to the Divisional Committee; as the Department had done with similarly situated male candidates. Rather, the Department had to scrutinize Namenwirth because it stood as the last bulwark of meritocratic ideals in the face of a University hierarchy willing to rubber-stamp the recommendation of any woman for tenure.

doubt.[25] But when a similarly-situated male turned out to be a marginal performer, i.e., Moermond, the entire Department was willing to give him the benefit of the doubt. In short, given Namenwirth's unhappy role as a pathbreaker, she had to perform better than a male to succeed. Such unequal treatment—however unconscious or subtle—violated Title VII.

**25.** Because Namenwirth was a marginal candidate, any procedure that focused attention on her faults would be fatal to her chances. Her faults were magnified because the Department felt compelled to subject her entire record to the most rigorous scrutiny, in part because she was a unique kind of candidate, *see supra* note 22, and in part because the Department perceived itself as the last bastion of meritocracy, *see supra* note 24. Thus, Professor Neess wrote:

> Our motives in subjecting Marion [Namenwirth] to what appears to me to be an unprecedented and unusually severe test may have been quite innocent, designed, as we seem to be telling ourselves now, only to give her more than the usual opportunities to receive favorable references. On the other hand, it could also be interpreted as though it had been intended to work just the other way around, all the more so because we appear to have wanted to weight [sic] the unfavorable material that came in much more heavily than the favorable.

Plaintiff's Exhibit 59.

Because of Moermond's sex, the Department did not feel compelled to subject him to the same kind of rigorous scrutiny. Accordingly, his marginality was never discussed and his faults never brought to light. The Department soon convinced itself that Moermond was an exceptional candidate.