# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-2438

YONG-QIAN SUN,

*Plaintiff-Appellant,*

*v.*

THE BOARD OF TRUSTEES OF
THE UNIVERSITY OF ILLINOIS;
RICHARD HERMAN; DAVID E. DANIEL;
ROBERT AVERBACK; JOHN H. WEAVER;
IAN M. ROBERTSON; AND JOSEPH E. GREENE,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 03-CV-2221—**Michael P. McCuskey,** *Chief Judge.*

ARGUED DECEMBER 5, 2006—DECIDED JANUARY 16, 2007

Before FLAUM, WOOD, and EVANS, *Circuit Judges.*

FLAUM, *Circuit Judge.* The University of Illinois did not grant Yong-Qian Sun tenure after numerous committees and faculty members considered his case. Alleging various procedural irregularities and nefarious motives, Sun filed suit against the Board of Trustees of the University as well as members of its faculty. After the defendants' counsel failed to comply with discovery and the court granted several motions to compel discovery, it entered

default judgment against the defendants. Soon after, the court vacated the default, and, eventually, granted summary judgment in favor of all defendants. Sun appeals both the vacation of the default judgment and the court's grant of summary judgment. For the following reasons, we affirm.

## I. BACKGROUND

The University of Illinois ("University") hired Yong-Qian Sun, a native of China, as an assistant professor in August 1997. He worked in the University's Department of Materials Science and Engineering in the College of Engineering ("the Department"). The Department evaluates assistant professors in their fifth year of employment for promotion to associate professor with tenure. If the Department decides to deny promotion and tenure, it issues the tenure applicant a notice of nonreappointment and ultimately terminates the professor's employment.

In 2001, a year before his tenure review commenced, Sun received the Donald Burnett Teacher of the Year Award. The winner of the award was announced in College and Department publications and received $8,000. In keeping with Department tradition, Sun and Pascal Bellon, a previous award recipient, were slated to choose the 2002 award winner. John Weaver, the Department Head, strongly suggested that Sun consider him for the award. Despite the suggestion, Sun and Bellon selected another faculty member, Robert Averback, as the winner. On April 9, 2002, when Sun sent Weaver an e-mail recommending that Averback be given the award, Weaver became extremely upset with Sun. The following month, Weaver informed Sun that he would no longer receive income generated by his online teaching, due to a change in Department policy. Interestingly, the policy change affected only Sun.

In the Spring of 2002, the Department was considering Sun's candidacy for tenure and promotion. At that time, John Weaver was Department Head and David Daniel was Dean of the College of Engineering. Robert Averback, Joseph Greene, and Ian Robertson were tenured faculty members in the Department. Richard Herman was the Provost of the faculty for the University. To aid the process, the Department's Promotion and Tenure Committee ("PTC") prepared and collected information about tenure candidates. The PTC obtained biographical information from the candidate, obtained written evaluations from selected scholars outside of the University, and compiled internal evaluations of the candidate's teaching, research, and public service. That information was compiled in a document known as a dossier. Averback and Greene served as two of the PTC's four members, and Averback acted as chairman.

Members of the faculty considered Greene powerful and influential because he controlled federal block funding ranging from $8 to $9 million per year, which meant that many professors in the Department relied on Greene's allocations to support their research. At a May 15, 2002 faculty meeting, during a recruitment discussion, Greene said that he would not accept any Chinese graduate students and that he would not interview them. Following the meeting, Weaver asked Greene about the comment. Greene said it was a stupid remark and that he had no problems dealing with Chinese people. Greene later called his comment a "throwaway remark," made to express his dissatisfaction with the length of a discussion on recruiting international students, including those from Asia. Greene had previously accepted and worked with two Chinese graduate students.[1]

---

[1] Greene's remark resulted in an exchange of e-mails, including an e-mail from Weaver to all of the professors in the Depart-
(continued...)

The PTC placed Averback in charge of obtaining external evaluators for Sun. This task was governed to a large degree by Provost Communication No. 9, a document that set out instructions for preparing a candidate's dossier. It provides, among other things, that evaluation letters must be sufficient in number, from appropriately selected individuals at peer institutions, and from objective evaluators without conflicts of interest. The candidate must be provided with an opportunity to nominate external evaluators, but the department must also seek letters from evaluators other than those suggested by the candidate. Communication No. 9 states that a "majority of the external evaluations should come from the department's, rather than the candidate's, nominations." It also states that the "candidate has no privilege of vetoing external reviewers, but may indicate individuals whom he or she considers inappropriately biased." However, the "candidate cannot reasonably request avoidance of more than one or two individuals." Communication No. 9 states that the external evaluations "are critical components of the dossier and play a major role in the decision-making process."

---

[1] (...continued)

ment which stated, "Friends, This is to reaffirm something that should be part of our department culture—that we welcome people from all lands, of all backgrounds, and that we seek to provide a supportive atmosphere for them to do the best work that they can."

Greene responded with an e-mail which stated that "[w]e should have agreed upon departmental [guidelines] (*not* strict numbers!) regarding the fraction of US/foreign graduate students we admit. I suggest that a reasonable goal would be 2/3 U.S. and 1/3 foreign with a 'maximum' of 50% foreign." (emphasis in original).

On May 21, 2002, Sun suggested, in writing, five external evaluators. Averback found three of the suggested evaluators inappropriate because they were from outside of the University's peer rank.[2] Averback gave the names of the other two suggested evaluators to Weaver, and Weaver formally requested the evaluations. One of the suggested evaluators provided an evaluation that was included in Sun's dossier. The other wrote back and, in his response, included a comment very critical of a paper co-authored by Sun. Averback determined that, based upon this comment and the fact that the evaluator resided outside of the U.S., the PTC would not include the letter from him.

Sun provided one name, in writing, of an evaluator he did not want used, and the PTC did not solicit a letter from that evaluator. Sun also orally informed Averback of additional persons that might be biased against him.[3] Averback testified that, because of problems he encountered with obtaining a sufficient number of qualified external evaluators, he eventually requested and obtained letters from the potentially biased evaluators—Michael Mills and Patrick Veyssiere.[4] Averback obtained a total of seven external evaluation letters. While several faculty members stated that they felt the letter from Mills

---

[2] The Department is one of the highest ranked departments of its kind in the country, and the University's College of Engineering is among the highest ranked Colleges of Engineering. This limited the number of evaluators who could be considered appropriate based upon Communication No. 9.

[3] Sun thought the two professors might be biased against him because he had negatively reviewed articles they had submitted for publication.

[4] Sources inside and outside of the Department recommended Mills as an external evaluator.

was somewhat weak, the majority of the faculty members who expressed an opinion stated that the external evaluation letters included in Sun's dossier were good.

Prior to 2000, the PTC was solely responsible for voting on tenure candidates and recommending to the Department Head whether tenure should be awarded. After Weaver became Department Head, this procedure changed so that the recommendation to the Department Head was based upon the vote of all tenured faculty in the Department rather than just the four members of the PTC. The first candidate for tenure subject to this procedure was Pascal Bellon, who was up for promotion and tenure in 2001. In Bellon's case, after two faculty meetings, ten faculty members voted in favor of tenure, ten faculty members were opposed to tenure, and one faculty member abstained. On September 27, 2001, Weaver wrote to Bellon and advised him that he would not be recommended for promotion. However, after Bellon appealed this decision to faculty and took various steps to explain and improve his dossier, he was recommended for tenure by a vote of 17-4.

In Sun's case, the first faculty meeting to discuss his candidacy for tenure was held on September 20, 2002. As the new Chairman of the PTC, Averback presided over the meeting. He began the meeting by discussing the necessary qualifications for tenure, noting that Sun did not meet the Department's standards in some areas. Weaver told the faculty that if they weren't certain about how to vote, they should vote "no." The Department selected Bellon to present Sun's case, and Bellon gave a positive presentation. During the meeting, both Weaver and Greene made remarks critical of Sun and Weaver downplayed the importance of teaching in a tenure decision.

On September 23, 2002, pursuant to the University's tenure evaluation process, Sun presented a colloquium

in which he discussed the research he had done at the University and answered questions. Prior to the colloquium, Sun met with Ian Robertson, another faculty member, to present a "rehearsal" of his colloquium material. Robertson urged Sun to revise the colloquium to make it resonate with faculty that were not experts in Sun's field. Because of these late revisions, Sun replaced some of his presentation slides with handwritten transparencies, which Weaver subsequently criticized.

On October 2, 2002, another meeting was held in which the faculty discussed Sun's qualifications and voted on whether he should be recommended for tenure. Prior to the vote, Weaver discussed Sun's candidacy with some members of the faculty and made negative comments. For example, Weaver asked Bellon how he was going to vote and suggested that Sun was not the kind of person he would want to be stuck with for 25 years. Bellon disagreed and walked away, although he felt pressured by Weaver. Ultimately, Bellon voted in favor of tenure. James Economy, the former head of the Department, testified that Weaver approached him two to three times to make negative comments about Sun and also discouraged him from voting. Despite his attempts, Weaver was not successful in influencing Economy's vote. The faculty voted by secret ballot, thirteen against tenure and six in favor. Shortly thereafter, Weaver asked for a vote of the PTC, which voted 4-0 against tenure. Weaver then notified Sun that he intended to recommend against tenure and that Sun had a right to appeal.

Sun asked the faculty to reconsider their decision and circulated a written appeal document. Prior to the faculty's appeal meeting, persons outside of the University, some of them very well-known in Sun's field, submitted approximately 21 letters in support of his candidacy. Weaver, after consulting with Dean Daniel, sent everyone in the Department an e-mail suggesting that the letters were not

appropriate and that they should not be considered. Despite Weaver's recommendation, the letters were provided to all members of the faculty before the appeal meeting.

On October 16, 2002, Sun asked a Department secretary for Donald Burnett's telephone number.[5] This prompted Weaver to enter Sun's office yelling, among other things, "Don't fuck with people outside the University!"; " Don't fuck with alumni!"; "You are screwing yourself!"; and "Five minutes ago I thought you had a good brain to pass on to your children. I don't think so anymore!" After Weaver left Sun's office, Sun wrote him a letter setting out these statements and protesting his behavior.

On October 28, 2002, Sun spoke with Dean Daniel and complained that his unsuccessful bid for tenure was a result of Weaver inappropriately influencing the faculty in retaliation for not receiving the teaching award. Sun requested that a different committee hear his appeal. Subsequently, Dean Daniel spoke to four members of the Department, all of whom thought Weaver's behavior was appropriate. Weaver admitted that he remarked to Sun that the Department Head should be eligible for teaching awards. Weaver also admitted using profanity when he spoke to Sun on October 16, but denied any inappropriate attempt to influence the faculty vote. On October 30, 2002, Daniel advised Sun via e-mail that Weaver's behavior was not inappropriate and that Sun's appeal would be heard by the original decision makers, i.e., the Department faculty.

On October 30, 2002, the faculty met to reconsider their recommendation. Weaver chaired the meeting, and Bellon

---

[5] Burnett is an influential alumnus of the University for whom the teaching award is named.

presented some of the information contained in Sun's additional letters of support. The faculty voted by secret ballot, returning nine votes in favor of tenure, nine votes against, and one abstention. Weaver advised Sun that the Department intended to affirm its original decision.

On November 5, 2002, Sun wrote to Gerald J. Janusz, the chairman of the Faculty Advisory Committee ("FAC"), a committee comprised of representatives elected from the entire University faculty, asking that the FAC consider his grievance over the denial of tenure. On November 14, 2002, Janusz appointed a subcommittee to investigate the procedures related to Sun's denial of tenure. (The FAC did not undertake any substantive review.) After Sun filed another grievance with the College of Engineering, the FAC subcommittee decided to defer its consideration of his appeal until the other investigation concluded.

On November 22, 2002, Sun filed a grievance with the College of Engineering Grievance Committee. In his grievance, Sun asked the College Grievance Committee to investigate misconduct during the evaluation of his promotion in the Department. Specifically, Sun alleged that: (1) Averback asked for negative comments from external evaluators and biased the evaluators against him; (2) Weaver was prejudiced against him because he did not nominate Weaver "for an award he did not deserve"; (3) Weaver verbally abused him and his children; (4) Weaver inappropriately influenced the committee meetings on his promotion by misrepresenting his contributions; (5) Weaver treated proxy votes unfairly by accepting negative votes and discarding positive votes; and (6) the same committee was improperly used to evaluate his appeal. The Grievance Committee investigated the procedures in Sun's case, and, on December 27, 2002, issued a six-page report, which stated:

> The Grievance Committee finds that while there were certain areas in which departmental procedures, as

well as the Department Head's handling, of Prof. Sun's promotion case could have been improved, it is our view that there were no procedural problems that ultimately resulted in an unfair or tainted adjudication of Prof. Sun's promotion case by the faculty of the Materials Science and Engineering Department. Consequently . . . we do not recommend that Prof. Sun's promotion case be reviewed in a second appeal.

In its report, the Grievance Committee discussed the specific allegations of misconduct, concluding that the evidence did not support many of the allegations. The Committee said, "while there is a perception on the part of some MatSE faculty members that Prof. Weaver was too forceful in his attempts to sway faculty voting, particularly given his role as head of the department, there is no evidence that Prof. Weaver's actions were the reason that the voting faculty of MatSE ultimately did not support the promotion of Prof. Sun in either the original or appeals votes on his case." The Grievance Committee also found no evidence that the use of the same committee to evaluate Sun's appeal resulted in a biased review.

Finally, the Grievance Committee report discussed Sun's allegations of verbal abuse by Weaver, stating, "there is evidence in this case that aspects of the 'Professionalism in the Work Place' memorandum distributed by the Dean on 9/18/02 were violated, particularly with respect to the use of disrespectful language and the display of unprofessional conduct." Nonetheless, the Grievance Committee concluded that Sun's allegations of verbal abuse were unrelated to his procedural allegations, since there was no evidence that the incident resulted in an improper handling of his promotion case. On January 22, 2003, Weaver resigned as Department Head, but remained a tenured member of the faculty. On January 24, 2003, Dean Daniel wrote to Sun, stating that, based upon

the Grievance Committee's report, he affirmed his previous recommendation that Sun be issued a notice of nonreappointment.

On March 20, 2003, Ian Robertson became the Interim Department Head. In April, he met with Sun and suggested that Sun resign from the selection committee for the Burnett Teacher of the Year Award because he had taken actions against the Department. Sun refused to resign, stating that he could be fair in his considerations, and pointed out that he represented only one of four votes. Robertson agreed with Sun, and Sun helped select the 2003 award winner.

Soon thereafter, the FAC resumed its investigation of Sun's complaint. On May 15, 2003, the FAC issued a six-page report to Provost Herman, which concluded that Sun's promotion and tenure dossier was not fairly considered. In reaching its conclusion, the FAC found that the "Department Head inappropriately tried to negatively influence the promotion and tenure vote on Professor Sun's dossier." However, the FAC further stated that "proof that he actually influenced a faculty member into changing his/her positive vote to a negative one is absent." Nevertheless, the FAC determined that there was "convincing evidence to conclude that Professor Sun's dossier did not get a fair hearing." The report noted other procedural irregularities, such as inconsistent treatment of absentee ballots, different and more exacting standards compared to previous candidates, and Weaver's presiding over the faculty appeal. The FAC recommended to Provost Herman that "a more fair and impartial evaluation of Professor Sun's promotion and tenure dossier be undertaken."

Although it recognized that certain aspects of Sun's evaluation may have been unfair, the FAC rejected the allegation that Averback tried to influence the outcome of Sun's case. It concluded that Averback was "entitled to

make negative evaluative comments about a candidate since he is a member of the faculty." The FAC noted that Averback's comments were made at an open faculty meeting. In addition, the FAC did not agree with Sun's allegation that Averback deliberately solicited letters from external evaluators who were biased. It stated that the "solicitation of an 'excluded' individual as an evaluator is consistent with Communication No. 9 which says that individuals cannot be excluded." After receiving the report of the FAC, Provost Herman decided that Sun's case should be reconsidered. Provost Herman, Dean Daniel and Robertson agreed that, because the faculty governance structure dictated that the faculty themselves decide promotion and tenure, the faculty should determine whether they could render a fair and impartial decision. If the faculty determined they could not be fair, an external committee would decide the matter.

On July 8, 2003, the faculty reconsidered Sun for tenure. Prior to this meeting, Sun provided Robertson with information about his professional activities since October 2002. Robertson considered this additional information to be marginal at best, so he decided not to add the material to Sun's dossier. According to Sun, he had a significant number of publications and accomplishments during this time which should have been added to his dossier. Despite the exclusion of the information, all questions about Sun's activities since the previous fall were answered during the discussion leading up to the vote. At the meeting, Robertson told the faculty that the FAC had determined that some of Weaver's activities were improper and may have tainted the decision. He also stated that it was determined by the FAC that there was no improper conduct regarding the outside evaluators. Robertson then polled the faculty members on whether they could fairly reconsider Sun's application for

tenure. The faculty voted 13-4 that they could render a fair and impartial decision.

After this vote, Bellon made a presentation and a discussion followed. The faculty then voted eight in favor of tenure and ten against tenure, with one abstention. Weaver, who was not at the meeting, provided a proxy vote, but Robertson did not count it. Robertson then asked the faculty to vote on whether they believed the matter should be referred to an outside committee. The vote was five in favor and six against, with two abstentions. On July 10, 2003, Robertson wrote a letter to Dean Daniel which he forwarded with Sun's dossier. In the letter, Robertson described what happened at the faculty meeting and included a paragraph that stated:

> While it is clear that Yong-Qian Sun is an excellent teacher and has . . . produced high-quality work, he has not been able to establish and sustain a high-quality research program at the University of Illinois. The usual indicators of high-quality work (number of invited presentations at international and national meetings, invitations to join conference organizing committees, research funding etc.) are missing. . . . [Sun's] total level of funding over a six-year period is $462,501, which comes to less than $80,000 per year. To put this in perspective, the average annual funding level per faculty in Materials Science and Engineering is in excess of $250,000. . . . While total funding should not be and was not an issue, Sun continues to resubmit proposals on similar topics, he does not appear to have learned from his failure, and he has not changed his approach to seeking funds from external agencies. . . . I recommend against the promotion of Yong-Qian Sun to the rank of Associate Professor with tenure.

On July 11, 2003, Dean Daniel forwarded Sun's dossier to the College Promotion and Tenure Committee for review.[6] Robertson's paragraph regarding his recommendation was included as part of the dossier.

The College Promotion and Tenure Committee ("Committee") consisted of six members, one of whom was Weaver. However, Weaver and another member of the Committee were not involved in the review of Sun's dossier. Two of the four remaining members had been on the Grievance Committee that considered Sun's case, a fact about which Sun complained to Dean Daniel on July 16, 2003. Although Sun complained about the Committee's composition, Daniel let it proceed because he wanted to see its report, particularly since it was the only appointed entity to evaluate promotion cases.

On July 17, 2003, the Committee sent a seven-page report to Dean Daniel. The report stated that, following the Committee's review, it concluded that the decision by the Department "to not promote Prof. Sun was 'reasonable' in the sense that it was consistent with not only the current standards and past practices established by the MatSE department, but also with the guidelines and procedures established by the Provost for promotion and tenure cases." The report then detailed the conclusions it reached following its review of Sun's record and its comparison of Sun's case to Bellon's. The report stated that the "negative departmental votes in the Bellon case indicate to us that the Bellon case was near the borderline of what is acceptable to the MatSE faculty for promotion to associate professor with tenure" and thus "offers an important point of reference for the Sun case." The Committee concluded

---

[6] The College Promotion and Tenure Committee is an entity distinct from the PTC, which represented Sun's department only, rather than the entire College of Engineering.

that: (1) there was no substantive difference in the formatting of the two dossiers; (2) the credentials of the external evaluators for Plaintiff and for Bellon were roughly comparable, although the overall credentials of Bellon's letter writers were perhaps slightly stronger than those writing for Sun; (3) the two cases were nearly equivalent as to classroom teaching; (4) although both cases were somewhat below average in graduate student supervision, Bellon's case was slightly stronger because he had supervised one Ph.D. student to completion and had published a larger number of journal articles with his students; (5) the quantity and quality for journal publications was roughly similar; (6) Bellon had a better record as to invited presentations, particularly those that were international in scope; (7) Bellon had a significantly better record of research funding; (8) the strength of the external evaluation letters was similar for both Sun and Bellon; and (9) the level of service in the two cases was comparable and satisfactory. The Committee concluded that the cases of Bellon and Sun were very similar in many categories, but Bellon's case was stronger in the areas of visibility, number of students graduated, impact of recent work, and record of research funding. It stated that there were no areas where Sun's case was superior to Bellon's and also concluded that the process by which the faculty arrived at their decision was reasonable.

After receiving the report, Dean Daniel conducted his own review of Sun's dossier, and he agreed with the Committee's evaluation. On July 21, 2003, Dean Daniel sent a letter to Provost Herman explaining the procedures followed in reviewing Sun's case after the FAC's report. Daniel informed Herman that his own reassessment of the Sun's case convinced him that he "does not meet the expectations for promotion and tenure in the College of Engineering." That same day, Herman wrote to Sun, informing him that a letter of nonreappointment would be forthcoming.

In August 2003, the Chairman of the FAC informed Provost Herman that two members of the College Promotion and Tenure Committee had also been members of the Grievance Committee that considered Sun's appeal. In an abundance of caution, Herman agreed to appoint an ad hoc committee at the University level to review the case. Herman selected the ad hoc committee and Sun found the proposed group acceptable. On October 14, 2003, Herman sent a letter to each of the members of the ad hoc committee. Herman enclosed a copy of Sun's dossier that included Robertson's comments. Herman also enclosed additional material Sun provided updating his dossier. He asked the ad hoc committee to determine whether the unfavorable recommendation was justified on the merits of the case or warranted higher levels of review. The ad hoc committee did not review the additional letters received following the initial Department vote.

Charles Tucker, a member of the ad hoc committee, stated in an affidavit that, in his three years on the Campus Promotion and Tenure Committee, he had the opportunity to review hundreds of dossiers for tenure candidates. Although Tucker and other committee members read Robertson's attached comments and considered them, Tucker said the comments were but one of several factors, and not the most important factor, in his evaluation of Sun's dossier. Instead, the discussions of the ad hoc committee "centered around the quality of the work of Professor Sun as reflected in his dossier with updates, and the traditional factors of service, teaching and research which are the bases for making determinations about tenure." Based upon his evaluation of the dossier and the other materials provided by Sun, Tucker thought he "was not deserving of tenure in the Materials Science and Engineering Department, one of the top two or three departments in the United States." The vote of the ad hoc committee was 3-1 against granting Plaintiff tenure.

On November 7, 2003, Provost Herman wrote a letter to Sun affirming the negative recommendation and recommending nonreappointment. On November 19, 2003, Sun appealed to Chancellor Nancy Cantor, complaining of procedural irregularities. The FAC also wrote to Chancellor Cantor and Herman to record their continuing concerns with the procedures followed. On November 24, 2003, Herman wrote Chancellor Cantor a four-page letter regarding the "long history" of Sun's case. In December 2003, Sun advised Herman that his list of 21 conference proceedings was not included in the dossier that was provided to the ad hoc committee. Herman thought that conference proceedings were not a significant part the dossier and their presence or absence was insignificant. Weaver, Daniel, Robertson, Averback and Greene all agreed that conference proceedings were not a significant part of the dossier. Even, Jian Ku Shang, Trudy Kriven, and James Economy, faculty members who were very supportive of Sun's tenure and felt that Sun was unfairly denied tenure, agreed that conference proceedings were not an important part of the dossier. On December 8, 2003, Chancellor Cantor wrote to Sun, advising him that she found no grounds for reversing the tenure decision.

On January 12, 2004, Sun filed his amended complaint in this case, alleging employment discrimination in violation of Title VII of the Civil Rights Act as well as violations of his rights under 42 U.S.C. § 1981 and 42 U.S.C. § 1983. During the discovery phase, Sun had a difficult time obtaining answers to interrogatories from the defendants, which resulted in two orders to compel discovery as well as sanctions. Upon granting a third motion to compel, the district court entered a default judgment against the defendants. Soon after, the defendants engaged new counsel and moved the court to vacate the default judgment, arguing, among other things, that their former lawyer's medical condition prevented him

from complying with discovery and that the defendants' other attorney and the defendants themselves were unaware of the situation. Although the court expressed skepticism about the reasons offered by the defendants, it granted the motion to vacate. After discovery closed, the defendants moved for summary judgment and the court granted it on all counts. Sun appeals both the vacation of the default judgment and the entry of summary judgment.

## II. DISCUSSION

Sun presents three primary arguments on review. First, he claims that the court abused its discretion when it vacated the entry of default judgment against the defendants. Second, Sun contends that issues of material fact remain as to whether he was denied tenure on the basis of race or national origin. Finally, he argues that the district court erred in granting summary judgment in favor of the defendants on his First Amendment claim.

### A. Default Judgment

On June 23, 2005, the district court granted Sun's third motion for sanctions, striking the pleadings of all defendants, defaulting them, and allowing Sun to proceed to trial on damages only. Then, on August 8, 2005, it granted defendants' Motion to Vacate Default Judgment. Sun claims that the court abused its discretion when it granted the motion, and he asks this Court to reverse the judgment of the district court, reinstate the defaults entered against all defendants, and remand this cause for trial on damages only. In order to have an entry of default vacated, the moving party must show: (1) good cause for the default; (2) quick action to correct it; and (3) a meritorious defense to the complaint. *Pretzel & Stouffer, Chartered v. Imperial Adjusters, Inc.*, 28 F.3d 42, 45 (7th Cir.

1994). Whether or not to vacate a default is in the sound discretion of the district court, and we will reverse such a determination only if the district court abused its discretion. *See Robinson Eng'g Co. Pension Plan and Trust v. George,* 223 F.3d 445, 448 (7th Cir. 2000).

In their Motion to Vacate Default Judgment and their memorandum accompanying it, defendants' new counsel offered a litany of excuses. They asserted that the defendants were personally innocent of any misconduct; that the district court should have given the individual defendants direct notice of the earlier sanctions; that they had a complete defense and should be allowed to present it; that the court's interest in deciding cases on the merits would best be served by vacating the defaults; and that one of the defendants' prior attorneys had medical conditions which interfered with his ability to manage the defense of the case.

One of the defendants' attorneys, Michael Cornyn, stated in his affidavit that he was in charge of coordinating and finalizing the discovery compliance of all defendants, and the defendants fully cooperated. Although he informed University Counsel of the first Motion to Compel and attendant sanctions, he did not inform them of the second or third. Moreover, he stated that he had been diagnosed recently as suffering from "two serious conditions" that had lasted at least for six months. A letter from Cornyn's treating doctor was produced under seal. Cornyn stated his belief that the medical conditions from which he suffered interfered with his ability to properly manage the defense to the defendants' detriment. William J. Brinkman, the other attorney of record for the defendants, swore that he had no personal knowledge of the second or third motions to compel. Another attorney, Mark Henss of the University's Office of University Counsel, likewise swore that he had no knowledge fo the second or third motions.

Sun challenged the excuses, first pointing out that the individual defendants had not even printed out some requested documents until after the default judgment was entered. Moreover, Sun noted that Cornyn's behavior was not out of character for him, because he had handled discovery requests in a similar fashion in another case, which also resulted in the entry of a default judgment against his client. *See Robinson v. City of Champaign*, Case No. 00-CV-2315 (C.D. Ill. 2002) (defendant's failure to provide answers to written interrogatories for more than six months resulted in default judgment). Sun also cited *Tango Music, LLC v. DeadQuick Music* for the proposition that an attorney's illness (in that case, depression) did not excuse his client from proceeding with a case. 348 F.3d 244, 247-48 (7th Cir. 2003). In *Tango*, we recognized that a client has "to take responsibility for the actions of is agents, including the lawyers whom it hires." *Id.* at 247. Finally, Sun pointed out that Brinkman had registered with the Electronic Case Filing System of the Central District of Illinois so that he received an electronic copy of each and every motion, order, and docket entry in this case.

In its opinion filed on August 8, 2005 the district court quickly disposed of defendants' contention that the court should have given them direct notice of their counsel's failures, calling it "completely outrageous." *Sun v. Bd. of Trs. of the Univ. of Ill.*, 229 F.R.D. 584, 590 (C.D. Ill. 2005). It also found that the individual defendants were not innocent of misconduct, because they "did not provide documents and answers to interrogatories until months and months after the deadline." *Id.* The court also expressed reservations about whether Cornyn's conduct was the result of his alleged medical conditions, noting the remarkable resemblance between the present case and the *Robinson* case. *Id.* Moreover, the court said, that "Brinkman's claims of lack of knowledge ring hollow."

*Id.* In short, the court concluded, "Defendants have not convinced this Court that the entry of default judgment was not warranted in this case." *Id.* at 591. Nonetheless, it added that "as much as [the] court finds all of these arguments lacking in merit, it does have an interest in having cases decided on the merits and concludes that sanctions lesser than default may be appropriate in this case." *Id.* It then granted the defendants' Motion to Vacate Default Judgment, but ordered serious sanctions against defendants' (former) attorneys.

Sun is likely correct that a district court abuses its discretion when it vacates a properly entered default judgment absent an explicit finding that the party seeking to vacate the judgment showed good cause for the default. After all, the language of our case law is mandatory, stating that a party seeking to vacate a default judgment *must* make the required showings. *See Pretzel & Stouffer*, 28 F.3d at 45. Unfortunately, both parties gloss over the antecedent issue of whether the entry of default judgment was proper in the first place. Federal Rule of Civil Procedure 55(a) provides that "when a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules . . . the clerk shall enter the party's default." We conclude that default judgment was an unduly harsh sanction in this case.

This Circuit has a well established policy favoring a trial on the merits over a default judgment. *C.K.S. Eng'rs, Inc. v. White Mountain Gypsum Co.*, 726 F.2d 1202, 1205 (7th Cir. 1984) (collecting cases). For that reason, a default judgment should be used only in extreme situations, or when other less drastic sanctions have proven unavailing. *Id.* Although a district court has the default judgment "readily available within its arsenal of sanctions," *id.* at 1206, it is a weapon of last resort, appropriate only when a party wilfully disregards pending litigation.

*See, e.g.*, *id.* at 1204 (district court would not vacate default where it concluded that defendants "believed they could ignore this case and throw themselves upon the mercy of the court by contending that their local counsel was incompetent"); *Calumet Lumber, Inc. v. Mid-America Indus., Inc.*, 103 F.3d 612 (7th Cir. 1997) (holding that entry of default judgment was proper where counsel knowingly skipped a hearing and failed to answer a cross-claim altogether); *Pretzel v. Stouffer*, 28 F.3d at 44 (holding entry of default proper where party did not file its answer or attend a status hearing).

As the district court likely realized when it vacated its entry of default, this case does not represent one of those rare situations in which entry of default is appropriate. While defendants' attorneys were by no means paragons of responsible lawyering, their involvement in the discovery process was consistent and ongoing. Although counsel should have promptly complied with the court's orders to answer outstanding interrogatories, their delay was not so extreme as to warrant an entry of default. Likewise, although the district court tried to use less drastic sanctions by twice imposing monetary penalties, it brought out the heavy artillery too soon. Instead of entering a default, punishing the defendants and giving the plaintiff a windfall, the district court should have imposed increased monetary sanctions against the attorneys who had caused the discovery delays. Accordingly, we affirm the district court's decision to vacate its improvidently granted entry of default judgment.

## B.  Race/National Origin Discrimination Claim

Sun next contends that the district court improperly granted summary judgment in favor of the defendants on his Title VII claim. We review a district court's grant of summary judgment de novo. Summary judgment is

appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court has one task: to decide whether there is any material dispute of fact that requires a trial. *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, we draw reasonable inferences from the underlying facts in the light most favorable to Sun. *Carreon v. Ill. Dep't of Human Servs.,* 395 F.3d 786, 790 (7th Cir. 2005).

Sun argues that the defendants denied him promotion and tenure on the basis of his race and national origin, in violation of Title VII of the Civil Rights Act. To establish a claim of disparate treatment, a plaintiff may proceed under the direct or indirect method. We consider Sun's Title VII claims under each method.

### 1. Direct Method

In order to establish a prima facie case of race or national origin discrimination under the direct method, Sun must prove that the defendants were motivated by animus based upon his race or national origin when he was denied promotion and tenure. *See Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006); *Mosley v. Maytag Corp.,* 2006 WL 213950, at *4 (C.D. Ill. Jan. 27, 2006). A plaintiff proceeding according to the direct method may rely on either direct or circumstantial evidence. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005).

Sun argues that the voting record of the PTC and Greene's comment about Chinese students provide cir-

cumstantial evidence of discrimination sufficient to raise a genuine issue of material fact under the direct method. Circumstantial evidence of discrimination is evidence which allows the trier of fact to infer intentional discrimination by the decisionmaker. *Id.* This Circuit has recognized three types of "circumstantial" evidence of intentional discrimination: (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination. *Id.* at 720-21. Sun's evidence falls into the first two categories.

Sun emphasized that, between the years of 1993 and 2003, the four members of the PTC voted on 19 promotion candidates, two of whom were Asian and from China and 17 of whom were Caucasian. According to Sun, the PTC voted unanimously against him and the other Chinese candidate and, in almost every case, voted unanimously in favor of the Caucasian candidates.[7] The district court disregarded this evidence, stating that it did not constitute "statistical" evidence that similarly situated employees outside the protected class received systematically better treatment. *See Mosley,* 2006 WL 213950, at *5-6. Although the sample size is insufficient to provide statistically reliable evidence, the PTC's voting pattern has some probative value regarding discriminatory employment practices. After all, *Rudin* recognizes pattern evidence of

---

[7] The other Chinese candidate was eventually given tenure and promoted—although not by the Department.

disparate treatment "whether or not rigorously statistical." 420 F.3d at 720. We do not hold, however, that a questionable pattern of promotion, standing alone, is sufficient evidence to withstand summary judgment.

Although Sun concedes that Greene's remark is not direct evidence of discrimination against him because Greene referred to "students" and not "professors," he argues that it shows that Greene harbored prejudicial views about Chinese people. Moreover, Sun asserts, the suspect remark was contemporaneous with the adverse employment action because the remark occurred at the time the PTC, of which Greene was a member, was discussing Sun's case and selecting external evaluators. Defendants contend, however, that Greene's remark about Chinese students was a "stray workplace remark" that is not evidence of discrimination. We have held that stray remarks that are neither proximate nor related to the employment decision are insufficient to defeat summary judgment. *Bahl v. Royal Indem. Co.,* 115 F.3d 1283, 1293 (7th Cir. 1997). At the same time, though, the statements of a person who lacks the final decision-making authority may be probative of intentional discrimination if that individual exercised a significant degree of influence over the contested decision. *Porter v. State of Ill., Dep't of Children & Family Servs.,* 987 F. Supp. 667, 673 (N.D. Ill. 1997), *aff'd,* 165 F.3d 32 (7th Cir. 1998).

If the PTC had made the final decision in Sun's case, its voting record coupled with the discriminatory remarks of one of its four members may have created a genuine issue of material fact. We need not decide that issue, though, because we have previously held that "when the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and a legally permissive basis, the bias of the subordinate is not relevant." *Willis v. Marion County Auditor's Office,* 118

F.3d 542, 547 (7th Cir. 1997). As the district court noted, "the final decision in this case was made by Herman, after multiple layers of review, including the review by the ad hoc committee." *Sun v. Bd. of Trs. of the Univ. of Ill.*, 429 F. Supp 2d 1002, 1023 (C.D. Ill. 2006). The numerous levels of review, particularly those conducted by independent and University-wide committees broke any connection between Greene's possible discriminatory motive and the ultimate decision.

Sun claims that Greene's illicit motives infected the entire process and points to a Third Circuit case in which the court stated that "a plaintiff in a discrimination case need not prove intentional discrimination at every stage of the review process." *Roebuck v. Drexel Univ.*, 852 F.2d 715, 727 (3d Cir. 1988). Sun's reliance on *Roebuck* is misplaced, however, because each evaluator in that case considered reports from the previous evaluators, thus tainting subsequent reviews and leaving the causal chain in tact. *Id.* By contrast, in Sun's case, subsequent reviewing committees had no report from the PTC committee that could have tainted their reviews or ultimate decisions. In addition, Sun's case is distinguishable from *Russell v. Bd. of Trs. of Univ. of Ill. at Chicago*, in which we concluded that the improper motives of the plaintiff's supervisor "had to be imputed to the other members of the disciplinary committee because of [the supervisor's] extensive role in initiating and carrying out the disciplinary process." 243 F.3d 336, 342 (7th Cir. 2001). Again, given the numerous reviews, both substantive and procedural, by committees outside of the Department and far removed from Greene's alleged influence, Greene could not be said to have an "extensive role" in making the tenure decision. Therefore, Greene's possibly improper motives cannot be imputed to the final decisionmaker. Accordingly, the district court correctly determined that

no genuine issue remained with regards to Sun's direct method claim.

### 2. Indirect Method

Sun also attempts to show that issues of fact remain under the *McDonnell Douglas* indirect method. Under this method, Sun must first establish a prima facie case of discrimination by showing that: (1) he is a member of a protected class; (2) he was qualified for tenure; (3) he was denied tenure; and (4) a similarly situated applicant not in the protected class was granted tenure. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973); *Namenwirth v. Bd. of Regents of Univ. of Wis. Sys.*, 769 F.2d 1235, 1240 (7th Cir. 1985); *Sinha v. Bd. of Trs. of Univ. of Ill.*, 2001 WL 921718, at *14 (N.D. Ill. Aug. 15, 2001). If Sun establishes a prima facie case, the burden of production shifts to the defendants to articulate a non-discriminatory reason for denying Sun's tenure. *See Namenwirth*, 769 F.2d at 1240. If the defendants produce a nondiscriminatory reason for the decision, Sun must then prove that the stated reason is merely a pretext for discrimination based upon race and national origin. *Id.* This is an extremely difficult burden to carry "[d]ue to the layered and subjective nature of the tenure process, and the courts' recognition that such decisions are based on the fine 'distinction between competent and superior achievement.'" *Sinha,* 2001 WL 921718, at *14, *quoting Kuhn v. Ball State Univ.,* 78 F.3d 330, 331 (7th Cir. 1996).

With respect to the prima facie case of discrimination, it is undisputed that Sun is Chinese and was subject to an adverse employment action, i.e., the denial of tenure and promotion. As usual, it is the second and fourth prongs that are at issue. Because the second prong is inextricably intertwined with the pretext analysis, we address prong four first—the identification of similarly situated individ-

ual who was treated more favorably. Sun identifies Pascal Bellon as a similarly situated, non-Chinese tenure candidate who was promoted and granted tenure. Bellon was in the same department as Sun and was a candidate for promotion and tenure one year before Sun. The FAC committee found that "different and more exacting procedures and standards were applied" in Sun's case, which could satisfy the fourth prong of the prima facie case. On the other hand, the College Promotion and Tenure Committee actually conducted a detailed comparison between Bellon and Sun, concluding that Bellon's dossier was superior to Sun's in a number of ways, including funding and invited presentations. That comparison identifies differences between the candidates, but does not necessarily show that they were not at least "similarly situated."

Assuming that Sun could, in fact, establish a prima facie case, the defendants have articulated a non-discriminatory reason for denying him tenure that is not pretextual. Specifically, they contend that Sun's dossier was simply inadequate, and multiple groups and individuals determined that he did not deserve tenure. This court has recognized that tenure cases require something more than mere qualification; the department must believe the candidate has a certain amount of promise. *Namenwirth*, 769 F.2d at 1242. Given the nuanced nature of such decisions, we generally do not "second-guess the expert decisions of faculty committees . . . ." *Vanasco v. Nat'l-Louis Univ.,* 137 F.3d 962, 968 (7th Cir. 1998).

In this case, the University's proffered reason is non-discriminatory, as it identifies weaknesses in Sun's dossier related to funding, scholarship, and supervision of graduate students. We know that the proffered reason is legitimate and not pretextual because Sun's dossier was considered numerous times by multiple committees,

including committees that had no interaction whatso-ever with Greene, Weaver, or Averback.

Ultimately, the indirect method of proving discrimina-tion attempts to isolate the cause of an adverse employ-ment action in order to determine whether it was moti-vated by discrimination. Where, as here, a plaintiff is afforded process sufficient to eliminate potentially discrim-inatory motives, summary judgment in favor of the defendants is proper. Although some of the defendants' actions early in the process may have caused Sun to lose faith in the fairness and integrity of the University's tenure and promotion decision, no reasonable jury could find that the final decision was based on Sun's race or national origin. To hold otherwise would discourage employers from identifying and correcting potentially unfair or discriminatory employment proceedings without legal intervention.

## C.  First Amendment Claim

Sun's final claim is that the individual defendants violated his First Amendment right to free speech, and that he was retaliated against for asserting those rights.[8] Specifically, he claims that his selection of the recipient of the teaching award constituted protected speech, as did his subsequent grievance against Weaver. To establish such a claim, Sun must show that 1) his speech was constitutionally protected and 2) that speech motivated the defendants' actions. *Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.* 278 F.3d 693, 699 (7th Cir. 2002). If Sun establishes these two elements, the burden shifts to the University to show that its interest in efficient man-

---

[8]  This claim is primarily against Weaver, although Sun makes some allegations against Robertson.

agement outweighed Sun's interest in freedom of expression, or that it would have denied Sun tenure regardless of the speech. *Miller v. Jones*, 444 F.3d 929, 935 (7th Cir. 2006).

Employee speech is protected when it relates to matter of "political, social, or other concern to the community." *Id.* This Court considers the content, form, and context of employee speech to determine whether it is on a matter of public concern, with the primary emphasis on content. *Id.* The defendants contend that Sun's decision not to nominate Weaver for the award was not speech on a matter of public concern. In response, Sun notes that educational improvement in public schools is a matter of public concern, citing *Klug v. Chicago Sch. Reform Bd. of Trs.*, 197 F.3d 853, 858 (7th Cir. 1999). He also asserts that his complaint to the FAC about Weaver's behavior was protected speech. The district court noted that this was a close question, but found the speech protected. We need not decide this question, however, because Sun's speech did not motivate the denial of tenure, and it is clear that the Department would have denied Sun's tenure regardless of his speech.

The district court noted that even if Weaver took retaliatory actions against Sun and attempted to influence the faculty regarding Sun's tenure and promotion, there is no evidence that anyone was actually influenced. Sun disagrees, stating that Weaver's influential position as Department Head and his attempts to exert that influence constitute circumstantial evidence that he influenced the vote. Although a reasonable jury could conclude that Weaver influenced some faculty members, the numerous subsequent reviews by independent decision makers once again break any causal chain between any retaliatory conduct and the ultimate decision not to promote Sun. Regardless of Weaver's alleged improper behavior, committee after committee found Sun's qualifica-

tions unworthy of tenure and promotion. Therefore, it cannot be said that Sun's speech motivated the decision.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment on all counts.

A true Copy:

　　　Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*