# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-2284

SHARON ADELMAN-REYES,

*Plaintiff-Appellant,*

v.

SAINT XAVIER UNIVERSITY and BEVERLY GULLEY,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 3269—**Samuel Der-Yeghiayan**, *Judge.*

ARGUED NOVEMBER 27, 2006—DECIDED SEPTEMBER 14, 2007

Before EASTERBROOK, *Chief Judge*, and ROVNER and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Sharon Adelman-Reyes filed suit in federal court alleging her former employer, Saint Xavier University ("University"), denied her tenure because of her Jewish faith in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2. Adelman-Reyes also alleged that the dean of the University's School of Education tortiously interfered with her prospective employment at the University by writing a negative tenure recommendation letter. The district court granted summary judgment for the defendants. Adelman-Reyes appeals, and we affirm.

**I. Background**

In 1998 Adelman-Reyes accepted a faculty position in the School of Education at Saint Xavier University in Chicago. Beverly Gulley, the dean of the School of Education, recommended Adelman-Reyes be hired and served as her supervisor. Initially Adelman-Reyes split her time between administrative duties as the Coordinator of Urban Initiatives and a teaching position in the English-as-a-Second-Language ("ESL")/Bilingual program. In 2001 she received a tenure-track teaching position, and in 2002 she applied for an associate professor position. Gulley wrote a letter to the University Rank & Tenure Committee supporting Adelman-Reyes's application, and in March 2003 Adelman-Reyes was promoted to associate professor. Shortly thereafter, Gulley formally evaluated Adelman-Reyes for the first time, and in the evaluation suggested she "attend service functions that support the School [of Education] and University from time to time."

Adelman-Reyes applied for tenure in the fall of 2003, triggering the University's tenure evaluation process. At St. Xavier, a tenure candidate's dossier is first evaluated by the candidate's college Rank & Tenure Committee, which makes a recommendation to the college dean for review. The dean, in turn, prepares a recommendation letter to the University Rank & Tenure Committee ("University Committee"). The dean's recommendation, along with the candidate's dossier, is forwarded to the University Committee for consideration and decision. The University Committee's decision is then sent to the Vice President of Academic Affairs, who makes a recommendation to the President, who formally confers or denies tenure.

In this instance, the School of Education Rank & Tenure Committee ("SOE Committee") recommended Adelman-Reyes receive tenure, rating her teaching as "good," her

scholarship as "excellent," and her service to the School of Education and the University as "good." This information was forwarded to Gulley. At this point in the process, the Vice President of Academic Affairs, Christopher Chalokwu, met with Gulley to discuss Adelman-Reyes's tenure application. Chalokwu perceived a personality conflict between Gulley and Adelman-Reyes and warned Gulley not to make the tenure process political. During this conversation, Gulley told Chalokwu that Adelman-Reyes missed "work or other University events due to the celebration of Jewish holidays."

Gulley ultimately recommended against tenure. Her formal letter to the University Committee rated Adelman-Reyes's teaching as "good," her scholarship and professional development as "very good," and her service as "fair." Gulley commented negatively about Adelman-Reyes's service on committees and mentioned negative student comments Adelman-Reyes had received in previous years. Gulley also cited declining enrollment trends in the ESL/Bilingual program, although Adelman-Reyes had no direct responsibility for program enrollment or marketing.

After reviewing Adelman-Reyes's tenure dossier, the SOE Committee's positive recommendation, and Gulley's negative recommendation, the University Committee rated Adelman-Reyes's teaching as "fair," her scholarship and professional development as "good," and her service as "good." The University Committee recommended Adelman-Reyes not receive tenure; Chalokwu and the President agreed. Muhammad Chishty, a University Committee member, characterized the deliberations on Adelman-Reyes's tenure application as considerable, extremely emotional, and heated. Chishty also told Adelman-Reyes that Gulley's negative recommendation weighed heavily in the University Committee's decision to deny tenure. This is consistent with Chalokwu's statement that a

dean's recommendation on tenure is ordinarily "very central" and "very crucial" to the tenure process.

Adelman-Reyes filed a formal grievance with the University challenging the denial of her tenure application. She alleged that Gulley discriminated against her because of her "strong advocacy stance for educational equity via bilingual education and [her] subsequent attempts to bring the content of the ESL/Bilingual Approval Program out of the margins and into the mainstream of the School of Education." Significantly, Adelman-Reyes did not allege discrimination on account of her religion. The faculty grievance committee concluded that Gulley's letter contained some unsupported assertions regarding Adelman-Reyes's qualifications for tenure; nevertheless, a formal hearing committee, which included one member selected by Adelman-Reyes, voted 2-1 to uphold the denial of tenure. The President in turn upheld this decision.

Adelman-Reyes then filed suit against the University and Gulley, and for the first time, accused the University of religious discrimination under Title VII, 42 U.S.C. § 2000e-2. The district court, granting the University's motion for summary judgment, held that Adelman-Reyes failed to establish a prima facie case of discrimination and failed to show that the University's reasons for denying tenure were pretextual. The district court also granted Gulley's motion for summary judgment on Adelman-Reyes's tortious interference claim because Adelman-Reyes did not raise any facts from which a reasonable jury could infer that Gulley acted with the state of mind required for this claim.

## II. Analysis

We review the district court's grant of summary judgment de novo, "construing all facts, and drawing all

reasonable inferences from those facts" in favor of Adelman-Reyes. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "[T]o avoid summary judgment, the nonmovant bears the burden of setting forth 'specific facts showing that there is a genuine issue for trial.'" *Vanasco v. Nat'l-Louis Univ.*, 137 F.3d 962, 965 (7th Cir. 2005) (quoting FED. R. CIV. P. 56(e)).

## A. Religious Discrimination Claim

Adelman-Reyes presents her Title VII religious discrimination claim under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), indirect burden-shifting method of proof. She therefore has the initial burden to establish a prima facie case of discrimination by showing (1) she is a member of a protected class, (2) she was qualified for tenure, (3) she was denied tenure, and (4) a similarly situated applicant not in the protected class was granted tenure. *Namenwirth v. Bd. of Regents of Univ. of Wis. Sys.*, 769 F.2d 1235, 1240 (7th Cir. 1985). If she establishes a prima facie case,[1] the burden shifts to the University to

---

[1] Adelman-Reyes contends the University failed to challenge her prima facie case in the district court. (The University focused on the reason tenure was denied and why that rationale was not pretextual.) Because Adelman-Reyes has the burden of establishing a prima facie case, the University's general assertion that she cannot do so is sufficient to put her to that burden and preserve the matter for appeal. Moreover, "we have frequently
(continued...)

offer a nondiscriminatory reason for denying Adelman-Reyes tenure. If the University does so, the burden shifts back to Adelman-Reyes to submit evidence that the University's proffered explanation is a pretext for religious discrimination.

The prima facie case and pretext inquiries often overlap; we may skip the analysis of a plaintiff's prima facie case and proceed directly to the evaluation of pretext if the defendant offers a nondiscriminatory explanation for its employment decision. *Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368 (7th Cir. 1998). We find it unnecessary here to evaluate whether Adelman-Reyes established a prima facie case.[2] The University has said it denied tenure because Adelman-Reyes did not show promise of continued contribution to the intellectual life of the University. This is a nondiscriminatory explanation, and Adelman-Reyes has not submitted evidence to create a triable issue as to whether this reason is a pretext for discrimination on account of her religion.

---

[1] (...continued)
warned litigants that the prima facie case must be established and not merely incanted." *Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002).

[2] The district court held that Adelman-Reyes failed to carry her burden of identifying a similarly situated tenure applicant not in her protected class who was treated more favorably. *Crawford v. Ind. Harbor Belt R.R. Co.*, 461 F.3d 844, 846-47 (7th Cir. 2006) (stating an employee is similarly situated if the employee is comparable to the plaintiff "in all material respects"). Although we are focusing our analysis on the issue of pretext, we note Adelman-Reyes identified Mitra Fallahi, another professor in the School of Education, as a similarly situated tenure applicant not of the Jewish faith who was treated more favorably. Adelman-Reyes and Fallahi became professors at the same time and sought tenure at the same time.

Important for the pretext analysis in this case, Adelman-Reyes does not claim the President or any member of the University Committee was motivated by religious bias in denying her tenure application—she claims only that Gulley was so motivated.[3] Accordingly, we will focus our attention on whether Adelman-Reyes has come forward with sufficient evidence to create a factual dispute on whether Gulley's reasons for recommending against tenure were pretextual.

"A pretext . . . is a deliberate falsehood." *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006). To show pretext, Adelman-Reyes must establish "'by a preponderance of the evidence that the legitimate reasons offered by . . . [the University, *i.e.*, Gulley] were not its true reasons, but were a pretext for discrimination.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Gulley recommended against tenure because of Adelman-Reyes's lack of service on School of Education and University committees, certain negative student comments, and declining enrollment trends in the ESL/Bilingual program. Adelman-Reyes's evidence is insufficient to permit a reasonable jury to conclude that these reasons were deliberately false.

The Supreme Court has held that "an employer would be entitled to judgment as a matter of law if the record

---

[3] In this case, the University can be liable under Title VII only if Gulley (as the lone alleged discriminator) influenced the adverse employment action. *Lust v. Sealy, Inc.*, 383 F.3d 580, 584-85 (7th Cir. 2004); *see also Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 919-20 (7th Cir. 2007) (stating summary judgment can be upheld despite discriminatory comment that had some influence on an employment decision). Adelman-Reyes has adduced enough evidence to permit a reasonable jury to infer that a dean's recommendation letter influences the University Committee's tenure decision.

conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves,* 530 U.S. at 148. The Court held in *Reeves* that "'[i]t is not enough . . . to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.'" *Id.* at 147 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993)); *see also Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 646 (7th Cir. 2006) ("In a word, the Plaintiff must establish that . . . [the employer's] reasons for the . . . [adverse employment action] were merely made up to cover up . . . [its] discriminatory reasons.").

Adelman-Reyes offered the following evidence that Gulley's reasons were pretext for religious discrimination: a colleague, Priscilla Hartwig, overheard Gulley say that Adelman-Reyes was a "liberal union-oriented Jew," and Gulley complained that Adelman-Reyes missed University events because of the Jewish holidays. There is nothing in the record linking the first of these remarks to the employment decision in question; we have previously held that "stray remarks that are neither proximate nor related to the employment decision are insufficient to defeat summary judgment*." Sun v. Bd. of Trs. of the Univ. of Ill.*, 473 F.3d 799, 813 (7th Cir. 2007). The second remark, though perhaps sufficiently linked to the employment decision, is not enough to establish pretext in the particular context of this case—a challenge to a university tenure decision. This is especially so in light of Adelman-Reyes's failure to even mention religious discrimination in her

formal grievance filed with the University,[4] and also her concession that neither the President nor the University Committee were motivated by religious bias. *Reeves*, 530 U.S. at 146; *Sun*, 473 F.3d at 815.

We have previously observed that "tenure cases require something more than mere qualification; the department must believe the candidate has a certain amount of promise. . . . Given the nuanced nature of such decisions, we generally do not 'second-guess the expert decisions of faculty committees.'" *Sun*, 473 F.3d at 815 (citing *Namenwirth*, 769 F.2d at 1242, and quoting *Vanasco*, 137 F.3d at 968). We accept that a dean's recommendation has significant influence on the tenure process. However, because tenure decisions typically involve "numerous layers of review" by "independent and University-wide committees," the causal connection between any possible discriminatory motive of a subordinate participant in the tenure process and the ultimate tenure decision is weak or nonexistent. *Id.* at 813. Accordingly, "in the absence of clear discrimination," we are generally "reluctant to review the merits of tenure decisions," recognizing that "scholars are in the best position to make the highly subjective judgments related [to] the review of scholarship and university service." *Farrell v. Butler Univ.*, 421 F.3d 609, 616 (7th Cir. 2005).

St. Xavier's tenure process was typical in that it involved multiple layers of independent review. Gulley's negative recommendation was reevaluated by the University Committee in light of Adelman-Reyes's complete

---

[4] In her formal grievance challenging the denial of tenure, Adelman-Reyes asserted that Gulley was biased against her because she strongly advocated bringing bilingual education "out of the margins and into the mainstream of the School of Education."

dossier and the SOE Committee's positive recommendation. The University Committee's recommendation was then reviewed by the Vice President of Academic Affairs and ultimately by the University's President. Adelman-Reyes's evidence is simply too weak to permit a reasonable factfinder to conclude that the reason she was denied tenure—that she showed insufficient promise of continued contribution to the University's intellectual community—was a cover for religious discrimination. Accordingly, the district court properly granted summary judgment in favor of the University on Adelman-Reyes's Title VII claim.

## B. Tortious Interference Claim

Adelman-Reyes sued Gulley in her individual capacity for tortious interference with prospective economic advantage. Illinois law governs this tort claim; to succeed, Adelman-Reyes must establish " '(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference.' " *Evans v. City of Chicago*, 434 F.3d 916, 929 (7th Cir. 2006) (quoting *Anderson v. Vanden Dorpel*, 667 N.E.2d 1296, 1299 (Ill. 1996)).

The district court concluded Adelman-Reyes could not establish the third element because Gulley's tenure recommendation did not cause the tenure denial. The court noted that the University Committee considered more than just Gulley's recommendation; it considered the SOE Committee's recommendation as well as Adelman-Reyes's complete dossier. Even assuming Adelman-Reyes could establish each element of the tort, however, the district court held that Gulley is insulated from liability based on

qualified privilege. Under Illinois law, a qualified privilege protects employers' officers from being sued for tortious interference. *Welch v. Ill. Sup. Ct.*, 751 N.E.2d 1187, 1197 (Ill. App. 2001); *Ali v. Shaw*, 481 F.3d 942, 945 (7th Cir. 2007) ("In the corporate world, officers enjoy immunity from . . . [tortious interference] claims provided that they took the action in pursuit of the legitimate interests of the company.") (citing *Swager v. Couri*, 395 N.E.2d 921, 927-28 (Ill. 1979)); *see also Fellhauer v. City of Geneva*, 568 N.E.2d 870, 877-79 (Ill. 1991) (holding that public employee discharged by official in charge of hiring and firing did not state a claim for tortious interference with economic advantage). The privilege can be abused (and thus lost) if the official acts maliciously. *Welch*, 751 N.E.2d at 1197.

Adelman-Reyes argues Gulley abused her privilege and thus is subject to liability, but the evidence falls far short of providing any basis from which to infer that Gulley acted maliciously. Malice in this context requires "a direct intention to injure" or with "a reckless disregard of . . . [Adelman-Reyes's] rights and of the consequences that may result" to her. *Kuwik v. Starmark Star Mktg. & Admin.*, 619 N.E.2d 129, 135 (Ill. 1993). There is evidence in the record of an ongoing conflict between Adelman-Reyes and Gulley about the future direction of the ESL/Bilingual program, and also that the University's grievance committee concluded certain statements in Gulley's adverse tenure recommendation were not properly supported.[5] But that is all.

---

[5] Adelman-Reyes cannot rely on evidence related to Gulley's alleged religious discrimination to support her tortious interference claim because the Illinois Human Rights Commission is vested with exclusive jurisdiction over claims that are "inextricably linked to a civil rights violation such that there is no inde-

(continued...)

As we have noted in affirming summary judgment on Adelman-Reyes's discrimination claim, tenure decisions "necessarily rely on subjective judgments about academic potential. Experienced faculty members may well come to different conclusions when confronted with voluminous and nuanced information about a colleague's overall capacity to make a long-term institutional contribution." *Vanasco*, 137 F.3d at 968. Moreover, "winning the esteem of one's colleagues is just an essential part of securing tenure." *Namenwirth*, 769 F.2d at 1243. Gulley's recommendation communicated her subjective opinion about Adelman-Reyes's suitability for tenure; it is worth noting that the University's established tenure process *required* her to submit it. There is no evidence suggesting Gulley went out of her way to sabotage Adelman-Reyes's career at the University. To the contrary, Gulley previously promoted Adelman-Reyes to a tenure-track teaching position and then recommended her for an associate professor position. Adelman-Reyes has produced no evidence from which a reasonable juror could infer that Gulley was acting recklessly or with a direct intent to injure her. Accordingly, summary judgment dismissing Adelman-Reyes's tortious interference claim was properly granted.

AFFIRMED.

---

[5] (...continued)
pendent basis for the action apart from the Human Rights Act itself." *Welch v. Ill. Sup. Ct.*, 751 N.E.2d 1187, 1196 (Ill. App. 2001); *see* 775 ILL. COMP. STAT. 5/8-111(C) (2006).

No. 06-2284                                                                                    13

A true Copy:

     Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*